**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Bobby Joe WILSON,**
**Defendant–Appellant.**

**No. 87–8914.**

United States Court of Appeals,
Eleventh Circuit.

Aug. 30, 1988.

---

Robert W. Ritchie, Knoxville, Tenn., for defendant-appellant.

F. Gentry Shelnutt, Jr., Julie E. Carnes, Asst. U.S. Attys., Atlanta, Ga., for plaintiff-appellee.

\* Honorable James C. Paine, U.S. District Judge for the Southern District of Florida, sitting by designation.

1. *See United States v. Bates,* 840 F.2d 858 (11th Cir.1988); *United States v. Miller,* 821 F.2d 546

Before TJOFLAT and KRAVITCH, Circuit Judges, and PAINE*, District Judge.

KRAVITCH, Circuit Judge:

Once more this court must decide whether evidence should have been suppressed as the fruit of a pretextual "seizure" of a person for violation of a traffic offense.[1] We conclude that the arrest of appellant did not violate the fourth amendment and that the district court did not err in denying appellant's suppression motion.

I.

As the facts are largely undisputed, we accept them as recited in the magistrate's report and recommendation. On the morning of March 1, 1987, Georgia State Patrol Trooper Michael Ralston was driving his cruiser south on Interstate 75 in Gordon County, Georgia. Ralston noticed a vehicle traveling north that was passing other cars heading in the same direction. Ralston activated his radar unit and determined that the observed vehicle was traveling 66 miles per hour in a zone with a speed limit of 55 miles per hour. Ralston decided to stop the vehicle for exceeding the speed limit, crossed over the median strip, and pursued the speeding car. During his pursuit, he noticed that the car was a Chevrolet Caprice bearing a Florida license tag. After following the Chevrolet for five miles, Ralston engaged his blue light and pulled the car to the side of the road.

Ralston asked the driver to step out of the car. He met the driver at the rear of the car and requested the driver's operator license and automobile registration. The driver furnished an expired Tennessee license issued to Bobby Joe Wilson and a Florida vehicle registration issued to Noel

(11th Cir.1987); *United States v. Smith,* 799 F.2d 704 (11th Cir.1986); *cf. United States v. Basey,* 816 F.2d 980 (5th Cir.1987); *Tarwid v. State,* 184 Ga.App. 853, 363 S.E.2d 63 (1987).

Welch. The driver, who was in fact Wilson, explained that he worked in Florida with Welch and had borrowed Welch's automobile to visit relatives in Knoxville, Tennessee. Ralston advised Wilson that he had been stopped for speeding and for following too closely. Ralston told Wilson that he needed to check the status of Wilson's operator license, but that he would issue a warning for the speeding if Wilson's operator license was in order.

Before he returned to the cruiser, Ralston looked inside the Caprice and saw, on the front passenger seat, a short white straw covered with a powdery substance. Ralston also observed two brown paper bags filled with tissues, a box of tissues, and a white container that appeared to be a bottle of Anacin. Ralston then radioed his headquarters to investigate the status of Wilson's operator license and Welch's vehicle registration. After ten minutes, Ralston learned that the vehicle registration was current but that Wilson's license had been suspended in Tennessee.

Ralston placed Wilson under custodial arrest and conducted a pat-down search of Wilson's person. During the pat-down, Ralston felt an object on Wilson's left leg and ascertained that the object was a .22–caliber revolver. After putting Wilson in the back seat of the patrol car, Ralston opened the right-hand door of the Caprice to investigate the short straw and the Anacin bottle. Ralston discovered more white powder inside the bottle and concluded that the powder was cocaine. The trooper then opened the trunk of the car, where he found an outboard motor gasoline can. Inside the can were several packages of what appeared to be cocaine.

A federal grand jury indicted Wilson on one count of possession with intent to distribute cocaine, in violation of 21 U.S.C.

§ 841, and one count of using and carrying a firearm during the commission of a felony, in violation of 18 U.S.C. § 924(c). Wilson moved to suppress all evidence obtained as a result of the search and seizure of his person and vehicle, raising the arguments to be discussed *infra* in this opinion. After an evidentiary hearing, a magistrate concluded that the search and seizure did not violate the fourth amendment and recommended that the evidence not be suppressed. The district court adopted the findings and recommendations of the magistrate. Pursuant to Fed.R.Crim.P. 11(a)(2), Wilson entered a conditional plea of guilty preserving his right to appeal the suppression order. Wilson now appeals his conviction.

## II.

### A.

■ Wilson argues that his arrest for driving with a suspended license was a mere pretext for Trooper Ralston's search and seizure of his person and vehicle on suspicion of narcotics offenses. We stress that Wilson does not argue that Ralston's initial stop of the vehicle for speeding was pretextual. This concession by Wilson sharply limits our task in this case. As the initial *stop* for speeding was neither pretextual nor lacking in probable cause, we may consider only whether the additional facts and circumstances occurring after Ralston decided to stop Wilson but before he arrested Wilson rendered the *arrest* for driving with a suspended license unreasonable.[2] "In assessing a claim of pretextual arrest, 'the proper inquiry is whether a reasonable officer *would* have made the seizure in the absence of illegitimate motivation.'" *United States v. Bates*, 840 F.2d 858, 860 (11th Cir.1988) (quoting *United States v.*

---

**2.** We do not imply that there will never be a circumstance in which probable cause will exist to justify a traffic stop but will not suffice to justify a more intrusive custodial arrest. Indeed, Wilson argues that under Georgia law, police officers have no power to make custodial arrests for the offense for which he was arrested, namely driving with a suspended license. Although we reject that argument in this case, we do not foreclose the possibility that state law

or municipal policy might prohibit police officers from making custodial arrests for certain minor offenses, and that a custodial arrest made for such an offense in disregard of that law or policy would be constitutionally unreasonable. *See, e.g., Young v. City of Atlanta,* 631 F.Supp. 1498, 1501, 1503 (N.D.Ga.1986) (noting that Atlanta police manual limits police officers' authority to effect custodial arrests for traffic offenses).

*Smith,* 799 F.2d 704, 708 (11th Cir.1986)) (emphasis in *Smith*). Of course, "probable cause for a stop does not justify an unrelated search," *Bates,* 840 F.2d at 861, but certainly information obtained during a valid stop can justify a subsequent arrest and search, if a reasonable officer would have made the arrest and search absent a pretext.

█ Wilson contends principally that Georgia law does not permit police officers to make custodial arrests for the offense of driving with a suspended license; accordingly, his arrest was unreasonable as a matter of law.[3] Wilson relies primarily on O.C.G.A. § 17–4–23(a):

> A law enforcement officer may arrest a person accused of violating any law or ordinance governing the operation, licensing, registration, maintenance, or inspection of motor vehicles by the issuance of a citation provided the offense is committed in his presence or informa-

tion constituting a basis for arrest concerning the operation of a motor vehicle was received by a law enforcement officer observing the offense being committed, except that, where the offense results in an accident, an investigating officer may issue citations regardless of whether the offense occurred in the presence of a law enforcement officer....

As Wilson interprets this statute, the section gives police officers the *authority* to make arrests for traffic ordinances ("A law enforcement officer *may arrest*....") but conditions that arrest authority on its being exercised by the issuance of a citation, not the execution of a fully custodial arrest. The government argues that the statute's use of the term "may arrest" merely provides law enforcement officers with the discretion to issue citations rather than make custodial arrests for traffic offenses and does not restrict their arrest authority to the issuance of citations.[4]

---

3. Wilson also relies on Georgia cases holding that "[a] search of a vehicle may not be made incident to the arrest of the driver for a mere traffic violation." *Mobley v. State,* 130 Ga.App. 80, 202 S.E.2d 465, 467 (1973) (defendant arrested for speeding and riding brakes; police discovered marijuana during search of vehicle), *overruled in part on other grounds sub nom. Patterson v. State,* 238 Ga. 204, 232 S.E.2d 233, *cert. denied,* 431 U.S. 970, 97 S.Ct. 2932, 53 L.Ed.2d 1067 (1977); *accord Rowland v. State,* 117 Ga.App. 577, 161 S.E.2d 422, 423 (1968) (defendant arrested for running stop light; police discovered evidence of possession of excess quantities of tax-paid whiskey during search of vehicle). As expressions of state law, these cases do not help Wilson. *Mobley* and *Rowland* hold only that a police officer has no authority to search a vehicle even after he has made a lawful arrest for a traffic offense. They provide no guidance as to the police officer's authority to make a custodial arrest for a traffic offense in the first place. The cases do not assist us in answering the crucial question posed by *Bates* and *Smith:* Would a reasonable police officer have made the *seizure* (here, the arrest) in the absence of illegitimate motivation? Under *Bates* and *Smith,* we must focus on the reasonableness of the decision to make the seizure, not the extent of the search made incident thereto.

To the extent that cases such as *Mobley* and *Rowland* state a rule of federal constitutional law, the accuracy of the rule stated therein is highly questionable since *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). *Belton* held that "when a policeman has made a lawful custodial arrest of the occupant

of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *Id.* at 460, 101 S.Ct. at 2864 (footnotes omitted). Admittedly, the search in *Belton* took place after the police officer arrested the occupants for possession of marijuana, not for a traffic offense, but Wilson has not attempted to distinguish *Belton* on that ground. We therefore have no occasion to consider whether the *Belton* rule justifies the search of an automobile incident to a lawful custodial arrest for a "mere" traffic offense.

4. Although the statutory use of the word "may" is usually interpreted as conferring discretion, not creating a mandatory duty, "[t]his commonsense principle of statutory construction is by no means invariable ... and can be defeated by legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute." *United States v. Rodgers,* 461 U.S. 677, 706, 103 S.Ct. 2132, 2149, 76 L.Ed.2d 236 (1983). Indeed, this principle of construction appears not to be presumptively correct under Georgia law. "The word 'may' has frequently been held to mean 'must.' The use of the permissive word 'may' is always to be considered in connection with its context and subject matter." *Wilson–Weesner–Wilkinson Co. v. Collier,* 62 Ga. App. 457, 8 S.E.2d 171, 176 (1940). In *Independent Bankers Association v. Dunn,* 230 Ga. 347, 197 S.E.2d 129 (1973), the Georgia Supreme Court held that a writ of mandamus could issue to compel the Superintendent of Banks to take action to restrain a clear violation of the banking law, even though the governing statute provided that "[t]he Superintendent of Banks of

Wilson's construction of the statute is not entirely without merit and has been accepted by at least one district court. *See Young v. City of Atlanta,* 631 F.Supp. 1498, 1503 (N.D.Ga.1986). His interpretation is fortified by the second sentence of the subsection, which states that an officer "may issue citations" whenever a traffic offense results in an accident, even if the accident occurs outside the presence of an officer. Presumably this second sentence is a grant rather than a restriction of authority; in permitting the issuance of citations for accidents occurring outside the presence of an officer, it expands the police officer's authority from that given in the previous sentence, which allows an officer to arrest by citation whenever a traffic offense is committed in his (or another officer's) presence.

We nevertheless adopt the government's construction rather than Wilson's for two reasons. First, the section on which Wilson relies must be understood against a statutory background that includes O.C. G.A. § 17–4–20(a), Georgia's general arrest statute. Section 17–4–20(a) provides that "[a]n arrest for a crime may be made by a law enforcement officer either under a warrant or without a warrant if the offense is committed in his presence or within his immediate knowledge...." This section, which predates section 17–4–23, gives police officers the authority to make warrantless arrests for traffic offenses committed in their presence even absent the authority conferred by section 17–4–23. The Georgia legislature did not need to enact section 17–4–23 to give Ralston the authority to make the arrest in this case.[5] We therefore think it more reasonable to construe

the "may arrest" language of section 17–4–23 as affording police officers the discretion to arrest by issuing citations, not as providing them with the power to arrest for traffic offenses only by citation.

Second, section 17–4–23 must be squared with O.C.G.A. § 17–6–11(a). Section 17–6–11(a) provides that a person who is arrested for violation of a traffic law (except any offense for which his license may be suspended for a first offense) and is served with a summons "may deposit his chauffeur's or driver's license with the apprehending officer in lieu of bail, in lieu of entering into a recognizance for his appearance for trial as set in the aforesaid summons, or in lieu of being incarcerated by the arresting officer and held for further action by the appropriate judicial officer." Although the term "may" is again employed, rendering the matter not entirely free from doubt, we think section 17–6–11(a) permits the issuance of a citation and the deposit of a driver's license as an alternative to custodial arrest and incarceration, while leaving such arrest and incarceration as a viable procedure. Such was definitely the case under the predecessor to section 17–6–11(a), which stated that a person arrested for violation of a traffic offense could *"upon agreement with the arresting officer"* deposit his driver's license in lieu of bail or incarceration pending an appearance before a magistrate. As the former section 17–6–11(a) authorized such alternatives to arrest and incarceration only upon agreement between the officer and the arrestee, it would hardly be sensible to construe another section of the Georgia Code as making such alternatives mandatory upon the arresting officer.[6]

this State *may* bring an appropriate civil action to enforce any provision of this Chapter...." " 'The true rule for the construction of the word *may* in a statute is, that when such statute concerns the public interest, or affects the rights of third persons, then, the word *may,* shall be construed to mean *must* or *shall.*' " 197 S.E.2d at 138 (quoting *Birdsong & Sledge v. Brooks,* 7 Ga. 88, 89 (1849)). In this case, we find a review of the statutory background and the purpose of O.C.G.A. § 17–4–23(a) more helpful than a rigid rule of construction.

5. The objection might be made that traffic offenses are not "crimes" within the meaning of § 17–4–20(a) and, therefore, that section affords no authority for arrests on traffic offenses. Whatever might be the force of this objection on other facts and circumstances, driving with a suspended license certainly falls within the statutory language. *See Jackson v. United States,* 352 F.2d 490, 491 (5th Cir.1965) (per curiam), *cert. denied,* 385 U.S. 825, 87 S.Ct. 55, 17 L.Ed.2d 62 (1966); *cf.* O.C.G.A. § 40–5–121(a) (driving with suspended license is misdemeanor).

6. The annotated edition of the Georgia Code

### B.

■ Wilson relies in the alternative on O.C.G.A. § 40–13–53(a) as support for his argument that Ralston had no legal authority to place him under custodial arrest. That section provides:

Subject to [certain exceptions], any officer who arrests any person for the violation of a traffic law or traffic ordinance alleged to have been committed outside the corporate limits of any municipality shall permit such person to be released upon being served with a citation and complaint and agreeing to appear, as provided in this article, unless such officer has reasonable and probable grounds to believe that the person will not obey such citation and agreement to appear.

Unlike O.C.G.A. § 17–4–23(a), this section states that an officer *shall* issue a citation to a person arrested for violation of a traffic ordinance. O.C.G.A. § 40–13–53(a) appears to make arrest by citation mandatory. For two reasons, we conclude that O.C.G.A. § 40–13–53(a) does not apply to the facts of this case.

First, section 40–13–53(a) governs only arrests for traffic violations "alleged to have been committed outside the corporate limits of any municipality." The record does not indicate that Ralston arrested Wilson outside the corporate limits of any municipality. Although the arrest was made by a state trooper (not a city police officer) on an interstate highway, we are unwilling to conclude from these facts alone that the site of the arrest lay outside the limits of any town or city. Wilson introduced no evidence below that would establish whether O.C.G.A. § 40–13–53(a) applied to this

case, and the magistrate made no findings on this issue.

Second, we do not believe that the term "violation of a traffic law or traffic ordinance" in section 40–13–53(a) includes the offense of driving with a suspended license. As the government points out, O.C.G.A. § 40–13–53(a) is part of an article in the Georgia Code governing the establishment and jurisdiction of traffic violations bureaus within the courts of the state of Georgia. O.C.G.A. § 40–13–60, also part of that article, states that "[a]ny traffic violation under the jurisdiction of the traffic violations bureau shall be characterized and classified as a traffic violation and shall not be considered as a misdemeanor." The Georgia Code elsewhere provides, however, that driving with a suspended license shall be considered a misdemeanor and shall be punishable by imprisonment for not less than two days and not more than six months. *See* O.C.G.A. § 40–5–121(a).

The Georgia legislature has expressly classified driving with a suspended license as a misdemeanor. We cannot believe that the legislature also intended for that offense to be classified as a "traffic violation" and *not* a misdemeanor whenever a traffic violations bureau is established under the authority of O.C.G.A. § 40–13–60. If driving with a suspended license is not a "traffic violation" within the meaning of O.C.G.A. § 40–13–60, it is almost certainly not a "violation of a traffic law or traffic ordinance" within the meaning of O.C.G.A. § 40–13–53(a), which was enacted at the same time and as part of the same act. In our view, therefore, driving with a suspended license is not an offense to which O.C.G.A. § 40–13–53(a) applies.[7]

---

indicates that the Georgia legislature enacted the predecessor to § 17–4–23 in 1969 and the predecessor to § 17–6–11 in 1973. It seems most unlikely that the Georgia legislature would first enact a statute requiring police officers to arrest traffic violators by citation only and would then, four years later, pass a law authorizing police officers to accept a driver's operator license in lieu of bail but implicitly preserving the officers' power to make a custodial arrest of traffic violators and to bring them before a judicial officer.

Furthermore, it is doubtful that Trooper Ralston would have had the authority under

§ 17–6–11 to accept Wilson's suspended driver's license in lieu of bail. Section 17–6–11 explicitly excepts from the police officer's authority to accept a driver's license in lieu of bail any situation in which the driver is arrested for a traffic offense carrying the suspension of the driver's license as a penalty. Ralston arrested Wilson for driving with a suspended license, which carries an additional period of suspension as a penalty. *See* O.C.G.A. § 40–5–121(b).

7. *Duncan v. Ricketts,* 232 Ga. 89, 205 S.E.2d 274 (1974), is not to the contrary. In that case, the Georgia Supreme Court held that a Georgia stat-

### III.

■ Having concluded that Ralston's arrest of Wilson was not unreasonable in law, we consider whether it was unreasonable under the facts and circumstances of this case. Would a reasonable police officer have arrested Wilson for driving with a suspended license absent a motive to conduct an unrelated search for narcotics not supported by probable cause? We conclude that a reasonable officer would have done so.

Much of the evidence on which Wilson relies is simply not relevant to the determination of whether Ralston's *arrest* of Wilson was pretextual. For example, Wilson introduced the testimony of Willis Kervin, a civil engineer who conducted a study of the speed of vehicles traveling on Interstate 75 in Northern Georgia. Kervin concluded that the average speed of vehicles traveling on I–75 was 69.1 miles per hour, or 3.1 miles per hour above Wilson's speed. Wilson also relies on Ralston's testimony at the suppression hearing. Ralston admitted that in April 1986 he attended a seminar sponsored by the Drug Enforcement Administration and the Georgia State Patrol concerning characteristics of drug couriers using the interstate highway system. Ralston learned at that seminar that drug couriers are frequently Hispanics traveling from Florida to large northern cities, carrying only a limited amount of clothing, and driving rental cars, cars with third-party registrations, or new cars with a large amount of mileage on the odometer. Wilson introduced a summary of records of the Georgia State Patrol indicating that the number of Florida registered vehicles stopped by Ralston increased by 610% from 1985 to 1986, and that this increase also represented a rise from 3% to 20% of the total number of vehicles stopped by Ralston.

There is no dispute that speeding is quite common on Interstate 75, even at speeds well above that at which Wilson was traveling, or that Trooper Ralston stopped many more Florida vehicles for speeding in 1986 than he did in 1985. Whatever relevance these facts might have to an explanation of Ralston's decision to *stop* Wilson for speeding, they have no bearing on Ralston's subsequent decision to *arrest* Wilson for driving with a suspended license.[8] Furthermore, Wilson has not challenged the magistrate's finding that Ralston decided to stop Wilson for speeding once Ralston ascertained that Wilson was driving at 66 miles per hour, i.e., before Ralston could have known that Wilson fit some points of the drug courier profile.

As to Ralston's decision to make a custodial arrest, Wilson essentially had no evidence indicating that this decision was unreasonable. One sheet of Wilson's summary of Ralston's investigative activity broke down Ralston's traffic stops into Florida

ute authorizing the revocation of parole without a hearing upon a parolee's conviction for a "crime" did not permit such revocation upon a parolee's failure to appear in court on charges of speeding and weaving across lines. The Georgia Supreme Court noted that the county in which the speeding and weaving took place had a traffic violations bureau; therefore the "traffic offenses" were not misdemeanors and also not "crimes" within the language of the parole revocation statute. The parolee had been charged with driving under the influence, which was and is a misdemeanor in Georgia, *see* O.C.G.A. § 40–6–391(c), but this charge was dropped. 205 S.E.2d at 275.

**8.** We do not mean that an illegal traffic stop will never taint a search incident to a subsequent arrest for a different offense if the police obtain probable cause to make the arrest during the illegal stop. In *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), a police officer made an illegal stop of an automobile to check the driver's operator license and registration. During the stop, the officer discovered marijuana in plain view on the car floor and arrested the driver of the automobile. The Supreme Court affirmed the state court's decision to suppress the marijuana as the fruit of an unconstitutional seizure. Presumably any evidence discovered during a search incident to the arrest would have been suppressed as well. *Cf. United States v. Hensley,* 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) (during investigative stop of defendant, officer observed revolver under passenger seat of car; defendant was arrested and search of automobile revealed three handguns; defendant challenged admission of all three handguns, but Supreme Court upheld stop as valid). We simply mean that the evidence adduced by Wilson cannot explain whether Ralston's *arrest* of Wilson, rather than his stop, was pretextual.

and non–Florida drivers given warnings, citations, both, or neither, but these statistics did not show that Florida drivers were placed in *custodial* arrest a disproportionate number of times. Indeed, the statistics suggest that Ralston was more lenient to Florida drivers than to non–Florida drivers once he stopped their vehicles; whereas 75% of drivers of Florida vehicles stopped by Ralston in 1986 were released with mere warnings, only 61% of other drivers were treated so lightly that year.

Not only was there an absence of evidence indicating that Ralston's arrest of Wilson was pretextual; Ralston testified that the arrest conformed to normal policies and practices of dealing with persons driving with a suspended license, even those persons not suspected of drug offenses. Ralston testified, "Anytime you have a person who is driving on a suspended license you arrest the person and take him to the sheriff's department whereas [sic] he can post bond, and the vehicle will be towed in, and someone else will have to come get the vehicle.... That's the way the department operates." Wilson offered no evidence suggesting that this was not the way the department operated, and the district court was entitled to credit Ralston's testimony.[9]

Ralston's action also appears reasonable in light of O.C.G.A. § 17–6–11(a). As explained above, that section permits police officers to accept a driver's operator license in lieu of detaining the driver and requiring him to post bond or appear before a magistrate. The police officer gives the driver a receipt for his license, which may be used as a permit to drive during the pendency of the case for which the license was deposited. It would be most odd if Georgia police officers could accept a *suspended* operator license in lieu of detaining a driver and could give the driver a receipt which was the equivalent of a *valid*

operator license in permitting the driver to use a motor vehicle in Georgia. Placing the driver under arrest and detaining him for a short time pending an appearance before a magistrate or a posting of bond seems a reasonable method of charging the driver with the offense of driving with a suspended license and removing the driver from the road. It is true, as Wilson suggests, that Trooper Ralston could have simply ordered Wilson out of the car, forbidden him to drive any further, and required him to make arrangements for having his car towed off the interstate highway. Such procedure, however, was not the only reasonable option available to Ralston.

Accordingly, the judgment of conviction is AFFIRMED.

---

9. Ralston had, of course, observed the short straw with the white powdery substance by the time he decided to place Wilson under arrest. The fact that Ralston may have suspected Wilson of possession of narcotics does not automatically mean, however, that Ralston's arrest of Wilson on an unrelated offense was pretextual. "An objectively reasonable stop is not invalid

solely because the officer acted out of improper motivation." *United States v. Smith,* 799 F.2d at 708–09. The relevant question, rather, is "whether under the same circumstances a reasonable police officer would have made the [seizure] *in the absence* of the invalid purpose." *Id.* at 709 (emphases omitted and added).