Michael POTTINGER, Peter Carter, Berry Young, et al., Plaintiffs,

v.

CITY OF MIAMI, Defendant.

No. 88–2406–CIV–ATKINS.

United States District Court, S.D. Florida.

Nov. 16, 1992.

Valerie Jonas, Public Defender's Office, Benjamin Waxman, Weiner, Robbins, Tunkey & Ross, P.A., Miami, FL, for plaintiffs.

Leon M. Firtel, Asst. City Atty., Miami, FL, for defendant.

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER ON PLAINTIFFS' REQUEST FOR DECLARATORY AND INJUNCTIVE RELIEF

ATKINS, Senior District Judge.

THIS CAUSE is before the court on the non-jury portion of this bifurcated trial, which focused solely on the issue of liability. The background relevant to the court's findings and conclusions regarding the City's liability can be summarized as follows.

Plaintiffs ("plaintiffs" or "class members") filed this action in December of 1988 on behalf of themselves and approximately 6,000 other homeless people living in the

City of Miami. Plaintiffs' complaint alleges that the City of Miami ("defendant" or "City") has a custom, practice and policy of arresting, harassing and otherwise interfering with homeless people for engaging in basic activities of daily life—including sleeping and eating—in the public places where they are forced to live. Plaintiffs further claim that the City has arrested thousands of homeless people for such life-sustaining conduct under various City of Miami ordinances and Florida Statutes. In addition, plaintiffs assert that the City routinely seizes and destroys their property and has failed to follow its own inventory procedures regarding the seized personal property of homeless arrestees and homeless persons in general.

Plaintiffs allege, pursuant to 42 U.S.C. § 1983,[1] that the property destruction and arrests, which often result in no criminal charges, prosecutions or convictions, violate their rights under the United States and Florida Constitutions. Because the arrested plaintiffs are released without further official process, the argument continues, plaintiffs never have the opportunity to raise such valid defenses as necessity or duress. As discussed below, plaintiffs do not challenge the facial validity of the ordinances or statutes under which they are arrested. Rather, they contend that the City applies these laws to homeless individuals as part of a custom and practice of driving the homeless from public places. Accordingly, plaintiffs do not argue that any of the ordinances should be stricken; instead, they ask that the City be enjoined from arresting homeless individuals for inoffensive conduct, such as sleeping or bathing, that they are forced to perform in public.

Upon careful review the evidence presented at trial and at prior proceedings and after weighing the various arguments presented throughout this litigation, the court finds that injunctive relief is warranted in this case for the following reasons, which are discussed more fully below. First, plaintiffs have shown that the City has a pattern and practice of arresting homeless people for the purpose of driving them from public areas. *See* section III.B. Second, the City's practice of arresting homeless individuals for harmless, involuntary conduct which they must perform in public is cruel and unusual in violation of the Eighth Amendment to the United States Constitution. *See* section III.C. Third, such arrests violate plaintiffs' due process rights because they reach innocent and inoffensive conduct. *See* section III.G.2. Fourth, the City's failure to follow its own written procedure for handling personal property when seizing or destroying the property of homeless individuals violates plaintiffs' fourth amendment rights. *See* section III.F. Fifth, the City's practice of arresting homeless individuals for performing essential, life-sustaining acts in public when they have absolutely no place to go effectively infringes on their fundamental right to travel in violation of the equal protection clause. *See* section III.H.2.

In essence, this litigation results from an inevitable conflict between the need of homeless individuals to perform essential, life-sustaining acts in public and the responsibility of the government to maintain orderly, aesthetically pleasing public parks and streets. The issues raised in this case reveal various aspects of this conflict which, unfortunately, has become intensified by the overwhelming increase in the number of homeless people in recent years and a corresponding decrease in federal aid to cities. Because some of these issues have arisen in prior proceedings in this case, we briefly outline the history of this litigation before turning to the merits of the present inquiries.

---

**1.** Section 1983 provides as follows:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State, or Territory, or the District of Columbia, subjects, or causes to be subjected, any Citizen of the United States or any other persons within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the person injured in an action of law, suit in equity, or other proper proceedings for redress.
42 U.S.C. § 1983.

## I. PROCEDURAL HISTORY

On December 23, 1988, plaintiffs filed this action against the City of Miami on behalf of themselves and thousands of other homeless persons living within the City. The court granted plaintiffs' request for certification of class action on July 21, 1989. As certified, the class consists of involuntarily homeless people living in the "geographic area bordered on the North by Interstate 395, on the South by Flagler Street, on the East by Biscayne Bay, and on the West by Interstate 95." *See* Order Granting Plaintiffs' Motion for Certification of Class Action, dated July 21, 1989, 720 F.Supp. 955.

### A. *The Complaint*

Specifically, plaintiffs allege the following in their six-count complaint:

Count I: that the ordinances under which the City arrests class members for engaging in essential, life-sustaining activities—such as sleeping, eating, standing and congregating—are used by the City to punish homeless persons based on their involuntary homeless status in violation of the protection against cruel and unusual punishment found in the Eighth Amendment to the United States Constitution;

Count II: that the City has used its legitimate arrest powers for the unlawful purpose of "pest control," that is, "sanitizing" its streets by removing unsightly homeless individuals, which amounts to malicious abuse of process;

Count III: that the arrests of homeless individuals are pretextual and amount to unreasonable searches and seizures in violation of the Fourth Amendment to the United States Constitution and Article I, Section 12 of the Florida Constitution;

Count IV: that the City's seizures of plaintiffs' property lack probable cause, are unreasonable and violate the Fourth, Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 12 of the Florida Constitution;

Count V: that the City's arrests of homeless individuals for essential, life-sustaining activities violate their right to due process, privacy and decisional autonomy in violation of the Fourteenth Amendment to the United States Constitution and corresponding provisions of the Florida Constitution; and

Count VI: that the right of homeless persons publicly to engage in essential activities such as sleeping, eating, bathing and congregating is "fundamental" for purposes of equal protection under the Fifth and Fourteenth Amendments to the United States Constitution; that arresting the homeless infringes upon these fundamental rights and other fundamental rights, such as the right to travel, and burdens the homeless as a suspect class; and that the City has no compelling interest in making these arrests. *See* Second Amended Complaint for Declaratory, Injunctive and Compensatory Relief/Class Action, filed September 8, 1989.

### B. *Prior Proceedings*

During the course of this litigation, plaintiffs have moved for injunctive relief on a number of occasions. On December 23, 1988, plaintiffs asked this court to enjoin the City from conducting systematic police "sweeps" of homeless areas prior to high-profile events such as the Orange Bowl Parade. Plaintiffs alleged that the City conducted the "sweeps" to harass the homeless and to remove them from sight. *See* December 23, 1988 Application for Preliminary Injunction and Incorporated Memorandum of Law. The court denied this motion based on an inability to fashion an injunction with the specificity required by Federal Rule of Civil Procedure 65(d).[2] *See* December 30, 1988 Order on Application for a Preliminary Injunction.

In April 1990, plaintiffs filed their Second Application for Preliminary Injunction after two burning incidents in Lummus Park in which City police officers awakened and handcuffed class members, dumped their personal possessions—includ-

---

**2.** Pursuant to Rule 65(d), "[e]very order granting an injunction and every restraining order ... shall be in specific terms [and] shall describe in reasonable detail ... the acts sought to be restrained." Fed.R.Civ.P. 65(d).

ing personal identification, medicine, clothing and a Bible—into a pile, and set the pile ablaze. Although the City expressed outrage over the incidents and reported that the officers were under investigation,[3] this court found the City's threat of disciplinary action insufficient and ordered it to issue a directive to its police units "not to destroy property collected at the time of contact with homeless persons and to follow their own written policy of preserving property obtained in any manner by their police units." April 26, 1990 Order on Plaintiffs' Second Application for Preliminary Injunction at 4. The court further stated that it would consider finding persons responsible for violating the order in criminal contempt. *Id.*

Despite the strong wording of this order, plaintiffs again sought injunctive relief in March of 1991 as a result of another incident related to the destruction of property as well as the forced removal of the homeless from certain public areas. *See* Motion for Order to Show Cause, Application for Further Injunctive Relief, and Request for Evidentiary Hearing, filed March 5, 1991. As established at the three-day hearing,[4] City police officers awakened homeless persons sleeping under the I–395 overpass and routed them to Lummus and Bicentennial Parks. The officers also distributed a notice advising homeless persons that the park closure hours would be strictly enforced and that unattended property would be confiscated and destroyed. Shortly thereafter, on February 11, 1991, police officers and solid waste workers arrived at Lummus and Bicentennial Parks with front-end loaders and dump trucks. The officers asked homeless persons to take their property and leave immediately. The officers and solid waste workers then removed belongings of both absent and present class members. Two homeless men present on the scene testified that the officers did not give them enough time to gather their belongings. Another man testified that when he returned from a health clinic to Bicentennial Park and attempted to retrieve his belongings from the City workers, he was threatened with arrest for obstructing justice.

Based on the record, the court found that the City had violated the court's April 26, 1991 order in two ways. *See* March 18, 1991 Order Finding City of Miami in Civil Contempt of Court's April 26, 1990 Order and Providing Further Injunctive Relief ("March 18, 1991 Order"). First, the City violated the court's express prohibition against the destruction of property collected at the time of contact with homeless persons. Second, the City violated its own written policy regarding the preservation of property. Although one of the officers present at the park clean-ups testified that the homeless persons' property looked like "junk to him," the court noted the following:

> [P]articularly under these circumstances, value is in the eyes of the beholder, as one man's junk is another man's treasure. Any police officer or city worker assigned to the various areas where homeless persons congregate should be well aware that homeless persons use shopping carts, plastic bags and cardboard boxes as means of transporting their possessions. Any asserted ignorance of this fact insinuates a narrowminded attitude that this court will not tolerate.

*Id.* at 14. As a result of these violations, the court found the City in civil contempt and as a sanction ordered the City to pay the Camillus House, which provides clothing, food and medical care to homeless persons, the sum of $2,500. In addition, the court further enjoined the City "from destroying property which it knows or reasonably should know belongs to homeless individuals." *Id.* at 24.[5]

---

**3.** At trial, the City presented evidence that the officers were ultimately disciplined. *See* Defendant's Exhibits 2A and 2B.

**4.** The court held an evidentiary hearing on plaintiffs' motion on March 6, 13, and 14, 1991.

**5.** The City appealed this order and also filed a Motion Seeking Clarification and Reconsideration of Order Entered March 18. The Eleventh Circuit relinquished jurisdiction on this matter so that this court could rule on the City's motion. In ruling on the City's motion, this court directed the City to deposit the monetary sanc-

On November 22, 1991, the City notified the court of its intent to evacuate and close for renovations two primary outdoor refuges for homeless individuals, Lummus Park and the area under I–395. *See* Notification to Court and Counsel Regarding Certain Projects. In response, on December 4, 1991, plaintiffs asked the court to enjoin the City from executing the projects. The court denied plaintiffs' application for injunctive relief based on the City's assurance that it would offer comparable or better housing to the homeless individuals displaced from the two areas. *See* Order on Plaintiffs' Application for Preliminary Injunction, dated December 13, 1992.[6]

On June 11, 1991, the court granted plaintiffs' motion to bifurcate the trial of this case, with the first portion of the trial focusing solely on the issue of liability to be tried without a jury and, assuming liability was found, the second portion of the trial on damages to be tried before a jury. *See* Order on Motion to Bifurcate. After presiding over the non-jury portion of the trial from June 15 through June 19, 1992, and after reviewing the parties' proposed findings and conclusions and post-trial memoranda, the court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

### A. *The Homeless Plaintiffs*

The plaintiffs are homeless men, women and children who live in the streets, parks and other public areas in the area of the City of Miami bordered on the North by Interstate 395, on the South by Flagler Street, on the East by Biscayne Bay, and on the West by Interstate 95. In making the factual findings underlying this order, the court relies in large part on the testimony at trial of a number of expert witnesses familiar with the plight of these and other homeless people.

Professor James Wright, an expert in the sociology of the homeless, testified that most homeless individuals are profoundly poor, have high levels of mental or physical disability, and live in social isolation. He further testified that homeless individuals rarely, if ever, choose to be homeless. Generally, people become homeless as the result of a financial crisis or because of a mental or physical illness.

While a mental or physical illness may cause some people to become homeless, health problems are also aggravated by homelessness. Dr. Pedro J. Greer, Jr., Medical Director of the Camillus Health Concern [7] and an expert in medical treatment of homeless individuals, testified that a higher incidence of all diseases exists among the homeless. For example, hypertension, gastro-intestinal disorders, tuberculosis and peripheral vascular disease occur at a much higher rate in homeless people. This is due to a variety of factors such as exposure to the elements, constant walking, sleeping and eating in unsanitary conditions, lack of sleep and poor nutrition. In addition, people without a home general-

tion of $2,500 in the court registry pending resolution of the appeal from the March 18, 1991 order. *See* January 22, 1992 Order on Defendant's Motion Seeking Clarification and Reconsideration of Order Entered March 18. The court further directed both parties to meet in an effort to resolve their differences regarding the March 18, 1991 order. On June 12, 1992, the parties submitted a report outlining the points on which they could and could not agree. *See* Parties' Report on Defendant's Motion Seeking Clarification of Order Entered March 18, 1991.

6. Additionally, the City filed a motion to dismiss and both parties filed motions for summary judgment. The court denied each of these motions. *See* December 14, 1989 Order Denying Defendant's Motion to Dismiss; September 18,

1990 Order Adopting Report and Recommendation of the Magistrate and Denying Both Parties' Motions for Summary Judgment.

Most recently, the City notified this court of its intent to evacuate two homeless "settlements" located on Watson Island and in a portion of Bicentennial Park. *See* Defendant City of Miami's Notification of Intent to Take Action, dated November 13, 1992. The City plans to remove all makeshift shelters from these locations and to arrest all homeless persons who refuse to leave. The court will address this matter by separate order after the plaintiffs have had an opportunity to respond to the City's notice.

7. The Camillus House is a privately funded, local homeless shelter run by the Brothers of the Good Shepherd.

ly have no place to store medication, no clock to determine when to take a pill, and no water with which to take it. Medical treatment of the homeless is hampered by the lack of beds and other facilities in the areas where the homeless reside. Lack of transportation further enhances the difficulty of the homeless in obtaining follow-up medical care. Improper diet and the stress of living outside can also aggravate mental illness.

Substance abuse, a component of both physical and mental illness, is also a factor contributing to homelessness. Dr. Greer testified that studies have shown that people are genetically predisposed to alcoholism, but that no such genetic link has been established with regard to drug addictions. Substance abuse also may be a consequence of being homeless. Professor Wright testified that many homeless people do not begin drinking until they become homeless; they use alcohol as a self-medication to numb both psychological and physical pain.

Chronic unemployment is another problem that many homeless face. Joblessness among homeless individuals is exacerbated by certain barriers that impede them from searching for work, such as health problems, the fact that they have no place to bathe, no legal address, no transportation and no telephone.

Professor Wright also testified that the typical day in the life of a homeless individual is predominated by a quest to obtain food and shelter. Because the lines at feeding programs are often long, some homeless individuals skip meals because they will miss obtaining a space in a shelter if they wait for food.

In summary, many of the problems described by the expert witnesses are both a cause and a consequence of homelessness. Furthermore, Dr. David F. Fike, a professor of social work and an expert on homelessness in Dade County, Florida, testified that the longer a person has been on the streets, the more likely it is that he or she will remain homeless.

The City has made laudable attempts, particularly in recent years, to assist the homeless. For example, the City resolved to participate, in conjunction with Dade County, the State of Florida and all agencies providing services to the homeless, in the development of an interim plan to provide resources to the homeless. *See* Miami City Commission Resolution No. 91–544, dated July 11, 1991. In addition, the City stopped enforcing its ordinance against sleeping in public after an Eleventh Circuit ruling called into question the validity of a similar ordinance.[8] However, many factors have frustrated the City's efforts to alleviate the problem of homelessness. Perhaps the most significant factor is the escalating number of homeless people.

The number of homeless individuals in Miami has grown at an alarming rate. According to Dr. Greer, the number of homeless treated medically at the Camillus Health Concern increased dramatically from 1984 to 1991. A disturbing aspect of the rise in homelessness is the increase in the number of families without shelter. One of the more poignant photographs in evidence shows two small children living beneath the I–395 overpass with their pregnant mother. Plaintiffs' Exhibit 26. As Dr. Greer commented, a second generation of homeless persons is being born right under our bridges.

The lack of low-income housing or shelter space cannot be underestimated as a factor contributing to homelessness. At the time of trial, Miami had fewer than 700 beds available in shelters for the homeless. Except for a fortunate few, most homeless individuals have no alternative to living in public areas.

The evidence presented at trial regarding the magnitude of the homelessness problem was overwhelming in itself. Then, shortly after the trial, one of the worst possible scenarios for homelessness occurred when Hurricane Andrew struck South Florida. Overnight, approximately 200,000 people were left without homes.

8. *See Hershey v. City of Clearwater,* 834 F.2d 937, 940 (11th Cir.1987) (finding unconstitutional portion of ordinance prohibiting sleeping in public).

In sum, this court has no difficulty in finding that the majority of homeless individuals literally have no place to go.

### B. *Property of the Homeless*

While most of the evidence presented at trial focused on the arrests of the homeless, the evidence presented at earlier proceedings related primarily to the property of homeless individuals. The court incorporates by reference the findings of fact and conclusions of law set forth in the orders dated April 26, 1990, concerning the Lummus park burning incidents, and March 18, 1991, concerning the property sweeps occurring in February of 1991.

The findings of fact concerning the nature of homeless persons' property can be summarized as follows: (1) property belonging to homeless individuals is typically found in areas where they congregate or reside; (2) such property is reasonably identifiable by its nature and organization; it typically includes bedrolls, blankets, clothing, toiletry items, food, identification, and a means for transporting the property such as a plastic bag, cardboard box, suitcase or shopping cart; (3) police officers and city workers assigned to the various areas where homeless persons congregate should be well aware of the appearance of such property; (4) homeless persons often make arrangements for others to watch property in their absence; (5) the homeless often arrange their belongings in such a manner as to suggest ownership—e.g., they may lean it against a tree or other object or cover it with a pillow or blanket; (6) by its appearance, the property belonging to homeless persons is reasonably distinguishable from truly abandoned property; (7) the loss of items such as clothes and medicine affects the health and safety of homeless individuals; (8) the prospect of such losses may discourage the homeless from leaving parks and other areas to seek work or medical care; and (9) a homeless person's personal property is generally all he owns; therefore, while it may look like "junk" to some people, its value should not be discounted. *See* March 18, 1991 Order.

Although the court has discussed the importance of safeguarding the personal possessions of the homeless in these earlier orders, the seriousness of the loss of such property cannot be overemphasized. Peter Carter, one of the named plaintiffs in this case, testified at trial that after being arrested for sleeping in Bicentennial Park, he returned to the park to find that all of his personal possessions were gone and that it took him three weeks to reassemble his personal papers. This loss affected his ability to obtain work because many prospective employers required identification. As a result, Carter, who now has a job and a place to live, remained on the street just that much longer.

For many of us, the loss of our personal effects may pose a minor inconvenience. However, as Carter's testimony illustrates, the loss can be devastating for the homeless.

### C. *Arrests of Homeless Individuals*

The City, as evidenced by the records presented at trial, has arrested thousands of homeless individuals from 1987 to 1990 for misdemeanors such as obstructing the sidewalk, loitering, and being in the park after hours.[9] The records show that the City arrested homeless individuals for standing, sleeping or sitting on sidewalks in violation of City of Miami Code § 37–53.1 (prohibiting obstruction of sidewalks);[10] for sleeping on benches, sidewalks or in parks in violation of Miami Code § 37–63 (prohibiting sleeping in public);[11] for sleeping in the park in violation

---

**9.** The approximately 3,500 arrest records submitted at trial were printed from a database as the result of a computerized search for arrestees who gave as their address Camillus House, a local homeless shelter, or the streets of Miami.

**10.** Section 37–53.1 prohibits "any person or any number of persons to so stand, loiter or walk upon any street or sidewalk in the city so as to obstruct free passage over, on or along said street or sidewalk after a request by a law enforcement officer to move on so as to cease blocking or obstructing free passage thereon." Miami, Fla., Code § 37–53.1 (1990).

**11.** Section 37–63 provides that "[i]t shall be unlawful for any person to sleep on any of the streets, sidewalks, public places or upon the private property of another without the consent

of Miami Code § 38–3 (prohibiting being in the park after hours); [12] for loitering and prowling in violation of Florida Statutes § 856.021 and Miami Code §§ 37–34 [13] and 35; [14] and for sleeping, sitting or standing in public buildings in violation of Florida Statutes § 810.08, .09 (prohibiting trespassing).

As discussed below in greater detail, the arrest records also show that many of the arrests for being in the park after hours were made less than an hour before the park was to reopen. In addition, the narrative sections of a majority of the arrest reports indicate that the individual arrestee was not disorderly, was not involved in any drug activity, and did not pose any apparent harm to anyone. Many of the records indicate that the arrestee was doing nothing more than sleeping. Peter Carter testified that he was doing just that when he was arrested in Bicentennial Park in 1988.

Carter stated that, during the time that he was homeless, he would sleep in Bicentennial Park or near Camillus House. He preferred the park because it had a restroom and running water. While in the park, he would stay with a group of fifteen to thirty other homeless people because it was safer to do so. Carter testified that, at around midnight on the night of his arrest, police officers arrived in cars and a paddy wagon. The officers told Carter and approximately fifteen others not to move, paired them, strapped their hands, put them into the paddy wagon and took them to the station. After taking statements in a room at the station, the officers took Carter and the others to jail and detained them another hour while they checked for any outstanding warrants. The officers released Carter and the other homeless individuals at approximately 4:00 a.m. Carter then walked back to Bicentennial Park with eight to ten other people and found that all of their belongings were gone. According to Carter, he and his companions were not bothering anyone while they were in the park; at the time of the arrest, he and the others were doing nothing more than sleeping.

The testimony and the documentary evidence regarding the arrests of the homeless—in addition to the sheer volume of homeless people in the City of Miami and the dearth of shelter space—support plaintiffs' claim that there is no public place where they can perform basic, essential acts such as sleeping without the possibility of being arrested.

## III. CONCLUSIONS OF LAW [15]

### A. *Jurisdiction*

Plaintiffs brought this action under the United States Constitution, Amendments I, IV, V, VI, VIII, IX, and XIV; the Florida Constitution, Article I, Sections 2, 5, 9, 12, 16, 17 and 23; and 42 U.S.C. §§ 1983 and 1988. The Court has jurisdiction based on 28 U.S.C. §§ 1331 and 1343.

---

of the owner thereof." Miami, Fla., Code § 37–63 (1990).

**12.** Section 38–3 provides that public parks shall be closed to the general public from 10:00 p.m. to 7:00 a.m. Miami, Fla., Code § 38–3 (1990).

**13.** Section 37–34 prohibits "any person to loiter or prowl in a place, at a time or in a manner not usual for law abiding individuals, under circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity." Miami, Fla., Code § 37–34(D) (1990). The section also defines circumstances justifying alarm and immediate concern for safety as

those circumstances where peace and order are threatened or where the safety of persons or property jeopardized. The police officer

must be able to point to specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant a finding that a breach of the peace is imminent or the safety of persons or property is threatened.

*Id.*

**14.** Section 37–35 provides in pertinent part that "A person commits the offense of loitering when he knowingly: (1) Loiters on any public street, public sidewalk, public overpass, public bridge or public place so as to obstruct the passage of pedestrians and vehicles." Miami, Fla., Code § 37–35 (1990).

**15.** To the extent that any findings of fact constitute conclusions of law, they are adopted as such; to the extent that any conclusions of law constitute findings of fact, they are so adopted.

As noted above, the City has displayed greater sensitivity toward the homeless and has made some attempts to address the problems of homelessness, particularly in recent years. However, the City's voluntary cessation of any of the allegedly illegal conduct does not deprive this court of the power to decide this case. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 632–33, 73 S.Ct. 894, 897–98, 97 L.Ed. 1303 (1953) (citations omitted). Because the plaintiffs have a reasonable expectation that the City will resume the alleged illegal treatment of the homeless that it might have ceased, and because the public has an interest in having the legality of the City's practices settled, the court is obliged to address the very difficult issues the parties have raised. *See id.* at 632, 73 S.Ct. at 897. This is so particularly where the problem of homelessness is more pervasive than ever.

### B. *Municipal Liability*

The City contends that plaintiffs have failed to establish municipal liability. Accordingly, the threshold question is whether the City may be held liable for the alleged acts. A local government may be liable under 42 U.S.C. § 1983 when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. New York City Dept. of Soc. Svcs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). To establish such a policy or custom, plaintiffs must show a persistent and widespread practice; random acts and isolated incidents are insufficient. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988); *DePew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir.1986). A city's continued failure to prevent improper police conduct when it has knowledge of that conduct is "precisely the type of informal policy or custom that is actionable under section 1983." *Id.* at 1499.

In the present case, plaintiffs have shown that the alleged arrests and unrea-sonable seizures of their property were not random, isolated acts. Plaintiffs presented records of the arrests of approximately 3,500 homeless individuals. As discussed in more detail below, *see* section III.D, the time of day of many of these arrests alone suggests a custom or policy by the City's police department. In addition, plaintiffs presented police department internal memoranda dated from 1986 to 1991 regarding various aspects of the arrests of the homeless. *See* Plaintiffs Exhibits 2–7. Almost all of the memoranda are directed to high-ranking police department officials or indicate some direction from other City officials. *See* section III.D (discussing internal memoranda showing, *inter alia:* City policy of driving homeless from public areas; active search for ordinances to replace anti-sleeping ordinance and to enforce against homeless who were not observed violating any laws; elimination of food distribution as strategy to disperse homeless). Plaintiffs also presented evidence of local newspaper articles about the arrests of the homeless. *See* Plaintiffs' Exhibit 8. Based on the evidence presented, this court has no difficulty in determining that policy-makers within the police department and within the City knew or should have known of the alleged arrests and violations of plaintiffs' property rights and that the City failed to take any steps to stop such conduct. Accordingly, municipal liability exists.

### C. *Cruel and Unusual Punishment*

Plaintiffs contend that the City's arrests of class members under various ordinances prohibit them from lying down, sleeping, standing, sitting or performing other essential, life-sustaining activities in any public place at any time. Plaintiffs argue that their status of being homeless is involuntary and beyond their immediate ability to alter and that the conduct for which they are arrested is inseparable from their involuntary homeless status. Consequently, plaintiffs argue, application of these ordinances to them is cruel and unusual in violation of the eighth amend-

ment.[16]

The judicial prohibition of status-based abuse of police power under the eighth amendment is not without precedent. In a leading United States Supreme Court case addressing the issue, the Court held that punishment of a person for his involuntary status of being an addict was cruel and unusual in violation of the eighth amendment. *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). Finding the status of being an addict similar to that of being mentally or·physically ill, both of which are innocent and involuntary, the Court stated the following:

> a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.

*Id.* at 666, 82 S.Ct. at 1420. The Court distinguished the punishment of the involuntary status of being an addict and the punishment of voluntary acts such as the use, purchase, sale or possession of narcotics or the disorderly behavior resulting from their use. *See id.*

Based on *Robinson,* courts have overturned vagrancy laws because they punish status or condition. In *Wheeler v. Goodman,* a district court found a vagrancy law to be constitutionally invalid because it punished mere status. 306 F.Supp. 58, 64 (W.D.N.C.1969), *vacated on other grounds,* 401 U.S. 987, 91 S.Ct. 1219, 28 L.Ed.2d 524 (1971).[17] Similarly, in *Headley v. Selkowitz,* 171 So.2d 368 (Fla.1965), the Florida Supreme Court stated that a vagrancy statute, even if facially valid, should not be applied to "innocent victims of misfortune" who appear to be vagrants, but "who are not such either by choice or intentional conduct." *Id.* at 370; *see also*

*Goldman v. Knecht,* 295 F.Supp. 897, 907–08 (D.Colo.1969) (finding vagrancy statute that punished status unconstitutional in violation of fourteenth amendment's substantive due process limitation); *Parker v. Municipal Judge,* 83 Nev. 214, 427 P.2d 642, 644 (1967) ("It is simply not a crime to be unemployed, without funds, and in a public place. To punish the unfortunate for this circumstance debases society."); *Hayes v. Municipal Court,* 487 P.2d 974, 981 (Okla.Crim.App.1971) (quoting *Parker* with approval); *Alegata v. Commonwealth,* 353 Mass. 287, 231 N.E.2d 201, 207 (1967) ("Idleness and poverty should not be treated as a criminal offense."). Again, voluntariness of the status or condition is the decisive factor.

The Supreme Court again applied the *Robinson* principle in *Powell v. Texas,* 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968). Justice Marshall, writing for a plurality of four Justices, found that the appellant was convicted not for his status as a chronic alcoholic, but for

> being in public while drunk on a particular occasion. The State of Texas thus has not sought to punish a mere status, as California did in *Robinson;* nor has it attempted to regulate appellant's behavior in the privacy of his own home. Rather, it has imposed upon appellant a criminal sanction for public behavior which may create substantial health and safety hazards, both for appellant and for members of the public, and which offends the moral and esthetic sensibilities of a large segment of the community. This seems a far cry from convicting one from being an addict, being a chronic alcoholic, being "mentally ill, or a leper."

*Id.* at 532, 88 S.Ct. at 2154 (quoting *Robinson,* 370 U.S. at 666, 82 S.Ct. at 1420–21).

**16.** The eighth amendment provides as follows: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The prohibitions of the eighth amendment apply to the states through the due process clause of the fourteenth amendment. *See Robinson v. California,* 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962).

**17.** Unlike the plaintiffs in the present case, the plaintiffs in *Wheeler* were arrested in their own home. Nevertheless, the idea that "[i]dleness and poverty should not be treated as a criminal offense" should be no less applicable to those who have no home. 306 F.Supp. at 63 (citing *Robinson v. State of California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962)).

Although the law is well-established that a person may not be punished for involuntary status, it is less settled whether involuntary conduct that is inextricably related to that status may be punished. An initial reading of *Powell* suggests that all conduct is outside the rule of *Robinson*. The plurality in *Powell* stated that

> [t]he entire thrust of *Robinson*'s interpretation of the Cruel and Unusual Punishment Clause is that criminal penalties may be inflicted only if the accused has committed some act, has engaged in some behavior, which society has an interest in preventing, or perhaps in historical common law terms has committed some *actus reus*. It thus does not deal with the question of whether certain conduct cannot constitutionally be punished because it is, in some sense, "involuntary" or occasioned by compulsion.

*Powell*, 392 U.S. at 533, 88 S.Ct. at 2154–55.

However, the *Powell* plurality was not confronted with a critical distinguishing factor that is unique to the plight of the homeless plaintiffs in this case: that they have no realistic choice but to live in public places. Justice White identified this distinction in his concurrence:

> The fact remains that some chronic alcoholics must drink and hence must drink *somewhere*. Although many chronics have homes, many others do not. For all practical purposes the public streets may become home for these unfortunates, not because their disease compels them to be there, but because, drunk or sober, they have no place else to go and no place else to be when they are drinking.... For some of these alcoholics I would think a showing could be made that resisting drunkenness is impossible and that avoiding public places when intoxicated is also impossible. As applied to them this statute is in effect a law which bans a single act for which they may not be convicted

under the Eighth Amendment—the act of getting drunk.

*Id.* at 551, 88 S.Ct. at 2163–64 (White, J., concurring) (emphasis in original). Although Justice White joined the majority in rejecting the appellant's challenge to his conviction, he did so only because he found the record insufficient to support the appellant's claim that his alcoholic condition compelled him to appear in public while drunk. *Id.* at 549–50, 88 S.Ct. at 2162–63. In contrast, as discussed below, the record in the present case amply supports plaintiffs' claim that their homeless condition compels them to perform certain life-sustaining activities in public.

As a number of expert witnesses testified, people rarely choose to be homeless. Rather, homelessness is due to various economic, physical or psychological factors that are beyond the homeless individual's control.

Professor Wright testified that one common characteristic of homeless individuals is that they are socially isolated; they are part of no community and have no family or friends who can take them in. Professor Wright also testified that homelessness is both a consequence and a cause of physical or mental illness. Many people become homeless after losing their jobs, and ultimately their homes, as a result of an illness. Many have no home of their own in the first place, but end up on the street after their families or friends are unable to care for or shelter them. Dr. Greer testified that once a person is on the street, illnesses can worsen or occur more frequently due to a variety of factors such as the difficulty or impossibility of obtaining adequate health care, exposure to the elements, insect and rodent bites, and the absence of sanitary facilities for sleeping, bathing or cooking.[18] Both Professor Wright and Dr. Greer testified that, except in rare cases, people do not choose to live under these conditions.

---

**18.** The photographs admitted during Dr. Greer's testimony depicting various locations where homeless people sleep and congregate show the filth, the exposure, and the lack of adequate facilities. For example, the photographs show that many of the homeless individuals sleep in the dirt on top of pieces of cardboard. A number of the photographs showed that plastic bottles were a common possession of homeless individuals. Dr. Greer testified that, without a fresh water supply, many homeless persons store water in plastic jugs when they can get it.

According to Professor Wright's testimony, joblessness, like physical and mental illness, becomes more of a problem once a person becomes homeless. This is so because of the barriers homeless individuals face in searching for a job. For example, they have no legal address or telephone. Also, they must spend an inordinate amount of time waiting in line or searching for seemingly basic things like food, a space in a shelter bed or a place to bathe.

In addition to the problems of social isolation, illness and unemployment, homelessness is exacerbated by the unavailability of many forms of government assistance. Gail Lucy, an expert in the area of government benefits available to homeless people, testified that many homeless individuals are ineligible for most government assistance programs. For example, Supplemental Security Income is available only to people who are sixty-five years of age or more, who are blind or disabled and who are without other resources. Social Security Disability Insurance is available only to workers who have paid into the social security fund for five of the past ten years prior to the onset of the disability. Aid to Families with Dependent Children is available only to low-income families with physical custody of children under the age of eighteen. The only benefit that is widely available to the homeless is food stamps.

Another notable form of assistance that is unavailable to a substantial number of homeless individuals is shelter space. Lucy testified that there are approximately 700 beds available in local shelters. However, approximately 200 of these are "program beds," for which one must qualify. In addition, some of these beds are set aside for families. Given the estimated 6,000 individuals who were homeless at the time of trial and the untold number of people left homeless by Hurricane Andrew, the lack of adequate housing alternatives cannot be overstated. The plaintiffs truly have no place to go.

In sum, class members rarely choose to be homeless. They become homeless due to a variety of factors that are beyond their control. In addition, plaintiffs do not have the choice, much less the luxury, of being in the privacy of their own homes. Because of the unavailability of low-income housing or alternative shelter, plaintiffs have no choice but to conduct involuntary, life-sustaining activities in public places. The harmless conduct for which they are arrested is inseparable from their involuntary condition of being homeless. Consequently, arresting homeless people for harmless acts they are forced to perform in public effectively punishes them for being homeless. This effect is no different from the vagrancy ordinances which courts struck because they punished "innocent victims of misfortune" and made a crime of being "unemployed, without funds, and in a public place." *See Headley v. Selkowitz,* 171 So.2d 368, 370 (Fla.1965); *Parker v. Municipal Judge,* 83 Nev. 214, 427 P.2d 642, 644 (1967). Therefore, just as application of the vagrancy ordinances to the displaced poor constitutes cruel and unusual punishment, *see, e.g., Wheeler v. Goodman,* 306 F.Supp. 58 (W.D.N.C.1969), *vacated on other grounds,* 401 U.S. 987, 91 S.Ct. 1219, 28 L.Ed.2d 524 (1971); *Headley v. Selkowitz,* 171 So.2d 368 (Fla.1965), arresting the homeless for harmless, involuntary, life-sustaining acts such as sleeping, sitting or eating in public is cruel and unusual.

The City suggests, apparently in reference to the aftermath of Hurricane Andrew, that even if homelessness is an involuntary condition in that most persons would not consciously choose to live on the streets, "it is not involuntary in the sense of a situation over which the individual has absolutely no control such as a natural disaster which results in the destruction of one's place of residence so as to render that person homeless." City's Post–Trial Proposed Findings of Fact & Conclusions of Law at 7. The court cannot accept this distinction. An individual who loses his home as a result of economic hard times or physical or mental illness exercises no more control over these events than he would over a natural disaster. Furthermore, as was established at trial, the City does not have enough shelter to house Mia-

mi's homeless residents.[19] Consequently, the City cannot argue persuasively that the homeless have made a deliberate choice to live in public places or that their decision to sleep in the park as opposed to some other exposed place is a volitional act. As Professor Wright testified, the lack of reasonable alternatives should not be mistaken for choice.

For plaintiffs, resisting the need to eat, sleep or engage in other life-sustaining activities is impossible. Avoiding public places when engaging in this otherwise innocent conduct is also impossible. Moreover, plaintiffs have not argued that the City should not be able to arrest them for public drunkenness or any type of conduct that might be harmful to themselves or to others. To paraphrase Justice ·White, plaintiffs have no place else to go and no place else to be. *Powell*, 392 U.S. at 551, 88 S.Ct. at 2163–64. This is so particularly at night when the public parks are closed. As long as the homeless plaintiffs do not have a single place where they can lawfully be, the challenged ordinances, as applied to them, effectively punish them for something for which they may not be convicted under the eighth amendment—sleeping, eating and other innocent conduct. Accordingly, the court finds that defendant's conduct violates the eighth amendment ban against cruel and unusual punishment and therefore that the defendant is liable on this count.

### D. *Malicious Abuse of Process*

In their claim for malicious abuse of process, plaintiffs contend that the City, through its police department, has used its legitimate arrest process for the unlawful purpose of harassing and intimidating homeless individuals to purge them from streets and parks.[20]

■■■ An action for abuse of process lies if prosecution is initiated legitimately but is thereafter used for a purpose other than that intended by the law.[21] *See, e.g., Miami Herald Publishing Co. v. Ferre*, 636 F.Supp. 970, 974 (S.D.Fla.1985); *Dunn v. Koehring Co.*, 546 F.2d 1193, 1199 (5th Cir.1977); *Jennings v. Shuman*, 567 F.2d 1213, 1217 (3d Cir.1977); Restatement (Second) of Torts § 682. Unlike malicious prosecution, the tort of abuse of process does not involve bringing an action without justification; rather, abuse of process is a misuse of "a process justified in itself for an end other than that which it was designed to accomplish." W. Prosser, Handbook of the Law of Torts 856 (4th ed. 1971); *see also Jennings*, 567 F.2d at 1218–19 (discussing differences between malicious use and malicious abuse of process).[22]

19. The City contends there is no legal basis for demanding that it provide low-cost housing for all of the county's homeless. The lack of sufficient shelter, of course, is not the City's problem alone. However, plaintiffs are not asking the City to shoulder the entire burden of solving the homeless problem. They ask only that the City not arrest them for performing harmless acts in public areas when they have no place else to go.

20. Additionally, plaintiffs urge this court to find that the City acted with malice. The court has found isolated instances that have occurred during this litigation, such as the Lummus Park burning incidents, to be "innately offensive and repulsive." *See* April 26, 1990 Order on Plaintiffs' Second Application for Preliminary Injunction. However, contrary to plaintiffs' contention, the evidence does not show that the City's objective of removing the homeless, however insensitive or improperly executed, was undertaken maliciously.

21. The City contends that a claim for abuse of process requires some official judicial process. However, this court is unaware of any case in which a court has held that the arrest process may not serve as the basis of an abuse of process claim.

22. In *Jennings*, the court explained the difference between malicious prosecution and malicious abuse of process as follows:

We begin by distinguishing the justification given for issuance of process from the use to which process is put. The justification may be either legitimate or illegitimate. If it is illegitimate, there is malicious use. Likewise the use to which process is put can be either legitimate or illegitimate, and, if illegitimate, there is malicious abuse. For example, if the defendant justifies issuance of process by untruthfully saying that the plaintiff solicited burglary and uses the process only to have him jailed, this is malicious use only. It is not malicious abuse because jailing is the purpose for which criminal process was intended. If the defendant has process issued based on the truthful statement that the plaintiff solicited burglary and then uses the threat of prosecution for purposes of extortion, this is malicious abuse only.

While a plaintiff must prove lack of probable cause in a malicious prosecution action, proof of this element is not required to establish malicious abuse of process. Prosser at 856; *Jennings,* 567 F.2d at 1218. No abuse of process exists when the process is used to accomplish the result for which it is created, regardless of an incidental motive of spite or ulterior purpose. *See Ferre,* 636 F.Supp. at 975 (abuse of process arises only when there has been perversion of court process to accomplish end which process was not intended by law to accomplish, or which compels party to do some collateral thing he could not legally be compelled to do) (citation omitted); *Bothmann v. Harrington,* 458 So.2d 1163, 1169 (Fla. 3d DCA1984) (no abuse of process when process is used to accomplish result for which it was created, despite incidental or concurrent ulterior motive) (citing Restatement (Second) of Torts § 682 comment b; Prosser at § 121). Applying these principles to the facts of this case, we now consider whether plaintiffs have established a claim for abuse of process.

After weighing the evidence presented at trial and at other stages of this litigation and after reviewing the numerous arrest records, *see* Plaintiffs' Exhibits 1A–1AAA, the court finds that plaintiffs have shown that the City has used the arrest process for the ulterior purpose of driving the homeless from public areas. The City's arrest sweeps in Lummus and Bicentennial Parks in February and March of 1990,[23] and the harassment of homeless residents in the City's "clean up" of those parks in February and March of 1991,[24] are two prominent examples. The existence of a strategy to disperse the homeless is also supported by the arrest records and internal memoranda that were admitted into evidence at trial. *See* Plaintiffs' Exhibits 1–7.

567 F.2d at 1218–19.

**23.** *See* April 26, 1990 Order on Plaintiffs' Second Application for Preliminary Injunction.

**24.** *See* Order Finding City in Civil Contempt of Court's April 26, 1990 Order and Providing Further Injunctive Relief; Transcript of March 13, 1991 Hearing.

### 1. Arrest Records

The arrest records show that a number of homeless individuals have been arrested for being in the park after hours just minutes before the park was to reopen. *See* Plaintiffs' Exhibits 1A–1AAA. In addition, a majority of the arrest records indicate that the homeless arrestee was not drunk or disorderly, was not in possession of any drugs, and generally posed no harm to himself or to anyone else; in fact, many of the officers reported that the arrestee was sound asleep and had to be awakened, that the person had no reason to be in the park except to sleep or that he or she had no place to go. The records also show that once the validity of the ordinance against sleeping in public was called into question,[25] the City resorted to other ordinances to remove homeless individuals from public areas. *Compare* Plaintiffs' Exhibits 1A–1AA (Arrest Records from 1987 through January, 1988) *with* Exhibits 1AA–1AAA (Arrest Records from February, 1988 through March, 1990) (showing significant increase in arrests under park closure, trespass and loitering ordinances after arrests under sleeping in public ordinance ceased). Indeed, some of the internal memoranda also indicate that the police department was actively looking for ordinances to replace the law against sleeping in public in order to continue arrest sweeps near Camillus House, where homeless often line up for food or shelter. *See, e.g.,* Plaintiffs' Exhibits 4G, 4J, 4K. *See also* Plaintiffs' Exhibit 3K (December 1, 1987 memorandum from police sergeant to assistant chief regarding homeless congregating near homeless shelter: "The current problem is the quick release by the Dade County Correction System resulting in the almost immediate return of derelicts back to the area. Another problem is the lack of proper legislative laws dealing with vagrants.").

**25.** On December 27, 1987, the Eleventh Circuit found unconstitutional part of a Clearwater ordinance against sleeping in public. *Hershey v. City of Clearwater,* 834 F.2d 937, 940 (11th Cir. 1987).

In sum, the timing of the arrests, the shift to ordinances other than the anti-sleeping law, and the memoranda indicating an active search for new ordinances and suggesting a desire to eliminate the homeless presence, all support plaintiffs' contention that, at least in the past, the arrests were made for an ulterior purpose.[26]

### 2. Internal Memoranda

Like the arrest records, various internal memoranda from the police department suggest that the City's primary purpose was to keep the homeless moving in order to "sanitize" the parks and streets. *See generally* Plaintiffs' Exhibits 2A–7C. For example, a park development program proposed in April of 1986 listed "vagrant control" as an item including goals of removing "undesirables" from the park and discouraging their return. *See* Plaintiffs' Exhibit 2B.

References to goals or strategies of eliminating or eradicating the presence of homeless or of getting the homeless to move out of certain locations appear throughout the memoranda. *See, e.g.,* Plaintiffs' Exhibit 7C (February 7, 1991 memo from deputy police chief to chief of police reporting that city manager instructed police department to enforce all applicable violations in city parks to "address the homeless problems"). In an April 26, 1990 memorandum dealing with citizens' complaints about homeless people begging in a certain area, the chief of police advised the city manager as follows: "There are numerous homeless people wandering around this area *that are not violating any laws.* As you know, we must see a violation of law by these people before our officers can make an arrest on a misdemeanor charge." Plaintiffs' Exhibit 6G (emphasis added). In addition, the memorandum advised that a permanent watch order would be placed on the area, that "Directed Patrol Units" would be assigned to the area to enforce all violations of law, and that merchants would be encouraged to call the police when they observed a violation. *Id.* Here, the suggestion of an active search for any reason to arrest the homeless individuals in the targeted area, particularly in light of the acknowledgment that they were not violating any laws, supports plaintiffs' position that the City had a practice of arresting homeless individuals under various ordinances for the purpose of removing them from public areas.

As some of the memoranda reveal, one particularly troubling strategy was to eliminate food sources that attracted homeless people. For example, in a December 5, 1987 memorandum to an assistant police chief, a patrol supervisor responding to a citizen complaint about "derelicts" frequenting his property identified the problem as follows: "The Camilus [sic] House by giving free food at certain times during the day, causes the poor and needy to 'camp out' [in the area] awaiting their expected nourishment." Plaintiffs' Exhibit 3L. The supervisor reported that, to solve the problem, he had assigned a unit to "arrest and/or force an extraction of the undesirables from the area," and that the arrests "produced immediate positive results." *Id.* The patrol supervisor further explained that the

> reason for the results is that because of the arrest, they are taken from the immediate area where the food is located. They are placed in the east wing of the jail where food is not served. Consequently they do not get fed. What has occurred is that the vagrants now await food in hidden areas around the Camilus House.

*Id.* It is unclear whether the citizen ever benefitted from these "positive results," as the officer was unable to contact him. *See also* Plaintiffs' Exhibit 6A (January 11, 1990 memo from patrol commander to police chief regarding, *inter alia*, relocation of feeding line, lack of existing law governing dispensing of food by church groups and possible use of anti-litter ordinance to arrest homeless in feeding lines).

---

**26.** Although the evidence shows the existence of the City's ulterior purpose for arresting the homeless, nothing in this order is intended to diminish the conduct of those police officers who have treated the homeless in a compassionate and humane way.

The testimony of Stuart Savedoff and Judy Phillips also suggests that the City had a strategy of eliminating food sources. Savedoff and Phillips, both participants in a feeding program for the homeless, testified that in December of 1989, police officers ordered them to stop their program and to leave the City property just as they were about to finish serving meals to several hundred homeless individuals. Savedoff testified that he asked the officer in charge if he and the other volunteers could have fifteen more minutes to serve the hundred people who remained in the feeding line. The officer refused, stating that the program was disturbing the peace. However, according to both Savedoff and Phillips, there was no one else in the area but the program volunteers and the homeless; no one was disturbing the peace or obstructing the sidewalk. Savedoff testified that the officer threatened to arrest him if he did not leave. Phillips testified that she complained about the incident to assistant city manager Herbert Bailey, who explained that the City did not want unsightly homeless people in the developing downtown area.

Finally, the testimony of various witnesses at trial substantiates plaintiffs' allegations that the arrests were made for a purpose not intended by the various ordinances. For example, Brother Paul Johnson, former Executive Director of Camillus House testified that he was regularly awakened between 4:00 and 5:00 in the morning by police who passed by the shelter and used their loudspeakers to order people sleeping outside the shelter to move along. In reference to plaintiffs' pretextual arrest claim but equally applicable here, Lou Reiter, plaintiffs' expert witness in police practices and procedures, testified that a reasonable officer would not have arrested homeless individuals for engaging in harmless conduct such as sleeping, sitting or congregating in a public area absent the City's invalid purpose of intimidating and harassing the homeless in order to dissipate them.

In summary, the arrest records, the internal police memoranda and the testimony presented at trial support plaintiffs' claim that the City used the arrest process for the ulterior purpose of harassing and dissipating the homeless.

 However, as reprehensible as arresting homeless individuals for this purpose may be, a defendant's ulterior purpose alone is an insufficient basis for an abuse of process claim:

> Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process, is required; and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions.

Prosser at 857 (footnotes omitted). In other words, abuse of process cases generally involve some form of extortion. *Bothmann v. Harrington*, 458 So.2d 1163, 1169 (Fla. 3d DCA1984). In addition, as one court from this district has made clear, the act constituting the misuse must occur *after* the process is issued. *Ferre*, 636 F.Supp. at 974.

In *Ferre*, the defendant counterclaimed that plaintiffs filed the lawsuit against him in order to drive him from office. The court determined that the defendant failed to state a claim for abuse of process because there was no *"post*-issuance of process abuse." *Id.* at 975. Similarly, in *Jennings*, the court found that the defendants' abuse of process occurred with the act, *after* process had been issued, of threatening the plaintiff with extortion. 567 F.2d at 1219; *see also Dunn v. Koehring,* 546 F.2d 1193, 1199 (5th Cir.1977) (defendant brought criminal proceedings against plaintiff and *thereafter* attempted to extort funds).

Here, although plaintiffs have marshalled substantial evidence to demonstrate that they were arrested for a purpose other than that intended by the law, they have not shown that the City performed any act beyond carrying the arrest process to its authorized conclusion. The challenged arrests were authorized by the ordinances under which they were made. As in *Ferre*, even though the arrest process may have

been initiated with the worst intentions and for the ulterior purpose of driving plaintiffs from public streets and parks, such conduct is not actionable under this claim without proof of some "post-issuance" act. Here, plaintiffs have not shown that the City committed any definite act constituting the alleged misuse that occurred after the issuance of process. Therefore, plaintiffs' malicious abuse of process claim must fail.

### E. Unreasonable Search and Seizure

Plaintiffs next contend that the City's arrests of homeless persons are pretextual in violation of the Fourth Amendment to the United States Constitution[27] and the corresponding provision of the Florida Constitution.[28]

■■■■ The proper inquiry for determining whether or not a seizure is pretextual is not whether the officer *could* validly have made the seizure, but whether under the same circumstances a reasonable officer *would* have made the seizure in the absence of the invalid purpose. *United States v. Smith*, 799 F.2d 704, 709 (11th Cir.1986); *see also United States v. Wilson*, 853 F.2d 869, 871 (11th Cir.1988), *cert. denied*, 488 U.S. 1041, 109 S.Ct. 866, 102 L.Ed.2d 990 (1989); *United States v. Bates*, 840 F.2d 858, 860 (11th Cir.1988) (citing *Smith*, 799 F.2d at 708–09). However, an objectively reasonable seizure is not invalid just because an officer acts out of improper motivation. *Smith*, 799 F.2d at 708–09. Rather, determination of whether a fourth amendment violation has occurred requires an " 'objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' and not on the officer's actual state of mind at the time of the challenged action taken." *Id.* at 709 (quoting *Maryland v. Macon*, 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2782–83, 86 L.Ed.2d 370 (1985)).

■■■ As stated, plaintiffs allege that the City has a pattern and practice of arresting homeless individuals for harmless conduct such as eating, sleeping or congregating in public when they have no place else to go. In support of their pretextual arrest claim, plaintiffs rely on the same evidence discussed in the previous section to show the City's improper purpose. They contend that, under the *Smith* analysis, no reasonable officer would have made these arrests absent the impermissible purpose of dissipating the homeless.

Unlike the courts in *Smith, Wilson,* and *Bates,* this court does not have before it the details surrounding the numerous challenged arrests. *Smith, Wilson* and *Bates* involved a single arrest with detailed evidence regarding the arresting officer's actions and the circumstances that existed at the time of the arrest. While plaintiffs have presented voluminous documentary evidence to support their contention that, in general, the City had an improper motive in arresting homeless people, plaintiffs have presented no specific evidence regarding any particular arrest. This court cannot determine whether a fourth amendment pretextual violation has occurred without being able to examine more detailed evidence related to "the facts and circumstances confronting [the arresting officer] at the time [of the arrest]." *Smith*, 799 F.2d at 709 (quoting *Maryland v. Macon*, 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2782–83, 86 L.Ed.2d 370 (1985)). Accordingly, the court cannot find that any one of the arrests was objectively unreasonable in violation of the fourth amendment and therefore plaintiffs' pretextual arrest claim must fail.

---

**27.** The fourth amendment states as follows:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

**28.** Article I, section 12 of the Florida Constitution provides that the "right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures . . . shall not be violated." *See* Fla. Const. art. 1, § 12.

### F. *Unlawful Seizure and Taking of Property*

Plaintiffs allege that the City has a pattern and practice of seizing and destroying their personal property or forcing them to abandon it at arrest sites in violation of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Florida Constitution. In addition, plaintiffs contend that the City routinely fails to follow its own inventory procedures with respect to the personal property of homeless people. In response, the City argues that plaintiffs have failed to establish that it has such a policy considering the City's written procedure regarding personal property that has been found or seized.[29] The City further argues that any interest plaintiffs have in their property is far outweighed by the government's interest in keeping public areas sanitary, in not being burdened by the logistics of handling property belonging to the homeless and in not having incrimina-

ting evidence that might be found subject to challenge. After carefully weighing the arguments of both parties in light of the relevant law, the court finds that plaintiffs' property rights are protected by the fourth amendment and that the City is liable on this count.[30]

▮▮▮▮▮ The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. A search or seizure is unreasonable if the government's legitimate interests in the search or seizure outweigh the individual's legitimate expectation of privacy in the object of the search. *See Maryland v. Buie*, 494 U.S. 325, 331, 110 S.Ct. 1093, 1096, 108 L.Ed.2d 276 (1990); *Colorado v. Bertine*, 479 U.S. 367, 372, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987). In addition, a seizure that is initially lawful may nevertheless violate the fourth amendment if "there is some meaningful interference with an individual's pos-

**29.** The City claims that the acts that gave rise to this Court's orders dated April 26, 1990 and March 18, 1991 were aberrations or random conduct, which do not amount to a pattern or practice of violating plaintiffs' property rights. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). However, as discussed herein, plaintiffs presented substantial evidence at trial showing that the City has a pattern and practice of arresting homeless individuals for the purpose of dissipating them. The evidence presented at trial and at earlier proceedings further indicates that the arrests and confiscations of property were pursuant to a City policy and that City officials were aware of such a policy towards the homeless. *See also* March 18, 1991 Order at 18 (regarding existence of a custom or practice of confiscating and destroying homeless persons' property); *cf. Stone v. Agnos*, 960 F.2d 893, 896 (9th Cir.1992) (rejecting homeless man's claim that his property, which was seized after he refused to leave public plaza, was destroyed in violation of the fourth amendment because neither mayor nor police chief effected destruction and such destruction was against city policy).

**30.** The court further finds that the City's seizure and destruction of plaintiffs' personal property violate the fifth amendment, which prohibits the taking of private property for public use without just compensation. U.S. Const. amend. V.

The City argues that plaintiffs' fifth amendment claim must fail because they have not

shown that their property was taken for a "public use." However, the United States Supreme Court has defined "public use" very broadly. *See Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 240, 104 S.Ct. 2321, 2329, 81 L.Ed.2d 186 (1984). In *Midkiff*, the Court stated that "[t]he 'public use' requirement is ... coterminous with the scope of a sovereign's police powers," *id.,* and that the proper test is whether "exercise of the eminent domain power is rationally related to a conceivable public purpose," *id.* at 241, 104 S.Ct. at 2329. In rejecting the argument that the government must use or possess the condemned property, the Court stated that "it is only the taking's purpose, and not its mechanics, that must pass scrutiny under the Public Use Clause." *Id.* at 244, 104 S.Ct. at 2331. Similarly, under the *Midkiff* analysis, the fact that the City does not actually use or possess the property taken from the homeless does not mean that there is no "public use," and therefore no taking under the fifth amendment.

Although the evidence does substantiate plaintiffs' claim that there have been "takings" of class members' property, the more difficult question in this case is how plaintiffs may be "justly compensated." The Supreme Court has defined "just compensation" as placing the property owner in the same position monetarily as he would have been if his property had not been taken. *United States v. Reynolds*, 397 U.S. 14, 16, 90 S.Ct. 803, 805, 25 L.Ed.2d 12 (1970). The court is unable to address this issue based on the evidence presented. Consequently, the issue of "just compensation" will have to be the subject of a separate evidentiary hearing.

sessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). For the reasons discussed below, we have no difficulty concluding that the gathering and destruction of class members' personal property is a meaningful interference with their possessory interest in that property. Balancing the "nature and quality of the intrusion on the [class members'] fourth amendment interests against the importance of the governmental interests alleged to justify the intrusion," such seizures unquestionably have more than a *"de minimis* impact" on the property interests of the homeless. *See Jacobsen*, 466 U.S. at 125, 104 S.Ct. at 1663. The more difficult question is whether an individual has a legitimate privacy interest in property that is seized in a public area.

■ Determining the nature of any legitimate expectation of privacy plaintiffs have in their personal property involves two inquiries: first, whether the individual has a subjective expectation of privacy in the belongings; and second, whether that expectation is one that society is prepared to recognize as reasonable. *See Wells v. Florida*, 402 So.2d 402, 404 (Fla.1981) (citing *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)).

■ Based on the evidence presented at trial and at earlier proceedings in this case, the court finds that plaintiffs have exhibited a subjective expectation of privacy in their belongings and personal effects. Evidence presented at the March, 1991 hearing showed that the class members maintain their belongings—e.g., bags or boxes of personal effects and bedrolls—in a manner strongly manifesting an expectation of privacy. *See* March 18, 1991 Order at 21. As this court previously found, property belonging to homeless individuals is reasonably identifiable by its appearance and its organization in a particular area. *Id.* Typical possessions of homeless individuals include bedrolls, blankets, clothing, toiletry items, food and identification, and are usually contained in a plastic bag, cardboard box, suitcase or some other type of container. In addition, homeless individuals often arrange their property in a manner that suggests ownership, for example, by placing their belongings against a tree or other object or by covering them with a pillow or blanket. *Id.* Such characteristics make the property of homeless persons reasonably distinguishable from truly abandoned property, such as paper refuse or other items scattered throughout areas where plaintiffs reside. Additionally, when class members leave their living areas for work or to find food, they often designate a person to remain behind to secure their belongings. Thus, whether or not they are present at their living site, plaintiffs exhibit a subjective expectation that their property will remain unmolested until they return.

Given plaintiffs' subjective expectation of privacy in their property, we must address the more difficult question of whether that expectation is legitimate, i.e., whether society is prepared to recognize plaintiffs' expectation of privacy as reasonable. Courts have identified several factors indicating whether or not a person's expectation of privacy in a particular place is one that society is prepared to recognize as reasonable. The two most relevant factors are whether the person occupying the property is a trespasser, *see Rakas v. Illinois*, 439 U.S. 128, 143–44 n. 12, 99 S.Ct. 421, 430–31 n. 12, 58 L.Ed.2d 387 (1979) (suggesting that wrongful presence on property supports no reasonable expectation of privacy); *United States v. Ruckman*, 806 F.2d 1471, 1473–74 (10th Cir.1986) (holding that person with no legal right to occupy land had no reasonable expectation of privacy in structure built thereon), and whether the property is left in a manner readily accessible and exposed to the public, *see California v. Greenwood*, 486 U.S. 35, 40–41, 108 S.Ct. 1625, 1628–29, 100 L.Ed.2d 30 (1988) (finding no reasonable expectation of privacy in garbage bags, or their contents, left for collection outside the home). Given these two factors, we must review the facts in the present case to determine whether society is prepared to recognize

privacy rights in the plaintiffs' property. Before doing so, however, it is worthwhile to emphasize that

> factors such as whether the [party asserting the privacy right] was a trespasser and whether the place involved was public "are, of course, relevant as helpful guides, but should not be undertaken mechanistically. They are not ends in themselves; they merely aid in evaluating the ultimate question in all fourth amendment cases—whether the defendant had a legitimate expectation of privacy, in the eyes of our society, in the area searched."

*State v. Mooney,* 218 Conn. 85, 588 A.2d 145, 153–54 (quoting *United States v. Ruckman,* 806 F.2d at 1476 (McKay, J., dissenting)), *cert. denied,* — U.S. —, 112 S.Ct. 330, 116 L.Ed.2d 270 (1991).

In *Mooney,* the court found that the homeless defendant had a reasonable expectation of privacy in the contents of his duffel bag and box, which he kept under the bridge abutment where he slept. 588 A.2d at 154. In so finding, the court considered society's high degree of deference to expectations of privacy in closed containers, the fact that the containers were located in a place that the defendant regarded as his home and the fact that, because the defendant was under arrest, he could not be at the place he regarded as his home to assert his fourth amendment rights when the search occurred. *Id.* at 160. Under these circumstances, the court concluded that "society's code of values and notions of custom and civility would cause it to recognize as reasonable the defendant's expectation of privacy in his duffel bag and box." *Id.* at 161. The court further stated the following:

> [t]he interior of [these items is], in effect, the defendant's last shred of privacy from the prying eyes of outsiders, including the police. Our notions of custom and civility, and our code of values, would include some measure of respect for that shred of privacy, and would recognize it as reasonable under the circumstances of this case.

*Id.* Similarly, the interior of the bedrolls and bags or boxes of personal effects belonging to homeless individuals in this case is perhaps the last trace of privacy they have. In addition, the property of homeless individuals is often located in the parks or under the overpasses that they consider their homes. As in *Mooney,* under the circumstances of this case, it appears that society is prepared to recognize plaintiffs' expectation of privacy in their personal property as reasonable.

Having determined that plaintiffs have a legitimate expectation of privacy in their personal property, the next consideration is whether the government's interest in searching or seizing the property of homeless individuals outweighs the individuals' expectation of privacy in their property. The City identifies three factors constituting its interest.

First, the City argues that any contraband or incriminating evidence that might be found during the process of inventorying homeless persons' property would be subject to challenge as "fruit of the poisonous tree." While the government has a legitimate interest in this area, the court cannot overlook the plaintiffs' interest in having their fourth amendment rights protected. This is so particularly where, as the *Mooney* court recognized, the interior of the bags, bundles or other containers in which homeless persons carry their belongings is the "last shred of privacy" they have. *Mooney,* 588 A.2d at 161. As in *Mooney,* this court finds that such property is protected by the fourth amendment, and that, if improperly seized, such seizure *should* be subject to challenge.

Second, the City contends that logistical problems associated with gathering, inventorying and storing personal property belonging to homeless persons will be unduly burdensome. Here, the City refers to its own written policy for handling personal property and found property. *See* Defendant's Exhibit 3 (describing "Policy for Handling Evidence, Found Property and Personal Property"). The policy requires, among other things, that property taken into custody by a police officer be marked,

tagged and packaged and that all containers be opened and the contents inventoried. *Id.* The court appreciates the City's concern about becoming a "clearinghouse" for personal property. However, following its own established procedure in treating the property of a homeless individual should place no more of a burden on the City than it does with respect to the property of any other person. For example, a homeless person's bedroll should be no more difficult to handle than a picnic blanket; possessions that are contained in a plastic bag, box or cloth bundle should be no more burdensome to inventory or store than possessions contained in a suitcase or a briefcase. In fact, the City's written policy regarding treatment of personal property expressly includes bags and boxes in its definition of containers.[31] Additionally, contrary to the concern expressed by the City, the City would not be expected to gather and store mattresses, cardboard shelters, lumber or illegally possessed shopping carts. The City would be required to do no more than to follow its own written policy.

Third, the City asserts its interest in having clean parks and streets. The court recognizes the City's interest in keeping its parks and public areas clear of unsightly and unsafe items. However, the City's interest in having clean parks is outweighed by the more immediate interest of the plaintiffs in not having their personal belongings destroyed. As this court previously found, the loss of items such as clothes and medicine threatens the already precarious existence of homeless individuals by posing health and safety hazards; additionally, the prospect of such losses may discourage them from leaving the parks and other areas to seek work, food or medical attention. *See* March 18, 1991 Order at 20. Furthermore, as provided in the March 18, 1991 Order, the City would not be prohibited from taking appropriate measures to guard against dangerous conditions posed by items such as mattresses with exposed springs. *Id.* at 22.

In sum, the property of homeless individuals is due no less protection under the fourth amendment than that of the rest of society. Requiring the City to follow its own written policy with respect to the property of the homeless class members should not be significantly more burdensome than it is with respect to any other property. Accordingly, the court finds the City liable for its unlawful seizures of class members' property.

### G. Due Process, Privacy and Decisional Autonomy

#### 1. Right to Privacy and Decisional Autonomy

Plaintiffs contend that the City's arrests of homeless individuals for essential activities such as sleeping, eating, standing and congregating in public violate their fundamental privacy rights. In support of this contention, plaintiffs cite Article I, Section 23 of the Florida Constitution, which provides that "[e]very natural person has the right to be let alone and free from governmental intrusion into his private life." Plaintiffs also rely on the Florida Supreme Court's interpretation of this provision:

> One of [the] ultimate goals of [this provision] is to foster the independence and individualism which is a distinguishing mark of our society and which can thrive only by assuring a zone of privacy into which not even government may intrude without invitation or consent.
>
> The right of privacy, assured to Florida's citizens, demands that individuals be free from uninvited observation of or interference in those aspects of their lives which fall within the ambit of the zone of privacy.

*Shaktman v. State,* 553 So.2d 148, 150 (Fla.1989).

Once a plaintiff shows that the government has intruded into a fundamental right of privacy, the government must show that the challenged regulation or act

---

**31.** The policy defines containers as including, but not limited to, bags, boxes, briefcases and luggage. *See* Defendant's Exhibit 3.

serves a compelling state interest through the least intrusive means. *Winfield v. Division of Pari–Mutuel Wagering, Dept. of Business Reg.*, 477 So.2d 544, 547 (Fla. 1985). In *Winfield*, the court recognized that it is the state, not the federal government, which is responsible for the protection of personal privacy, *id.* at 547–48 (citing *Katz v. United States*, 389 U.S. 347, 350–51, 88 S.Ct. 507, 510–11, 19 L.Ed.2d 576 (1967)), and noted that Florida has a stronger right of privacy and greater protection from governmental intrusion than is found in the United States Constitution. *Id.* at 548. However, the court also stated that the right to privacy is not an absolute shield against all governmental intrusion and that it will yield to a compelling governmental interest. *Id.* at 547. Furthermore, before the right of privacy attaches, "a reasonable expectation of privacy must exist." *Stall v. State*, 570 So.2d 257, 260 (Fla.1990), *cert. denied, Long v. Florida*, —— U.S. ——, 111 S.Ct. 2888, 115 L.Ed.2d 1054 (1991) (quoting *Winfield*, 477 So.2d at 547).

We first consider whether the zone of privacy protected by Article I, Section 23, of the Florida Constitution covers such acts as sleeping, eating or lying down in public. In determining whether a reasonable expectation of privacy exists, we look to the individual's expectation of privacy regardless of whether society recognizes that expectation as reasonable. *Shaktman*, 553 So.2d at 153 (Ehrlich, C.J., concurring). On the other hand, the "emphasis on each individual's expectations of privacy does not mean that the individual's subjective expectations are dispositive." *Id.* Rather, in any given case, the court must consider all the circumstances to determine whether an individual has a legitimate expectation of privacy. *Id.*

Plaintiffs argue that the essential, harmless activities which they are forced to conduct in public areas fall within the broad brush of Florida's right to privacy provision. Although, as discussed above, plaintiffs have shown a reasonable expectation of privacy in their personal effects, based partly on the high degree of deference to

expectations of privacy in closed containers, they have not demonstrated a reasonable expectation of privacy in performing certain activities in public places. While the focus of the right-to-privacy inquiry is the person, not the place, *see Shaktman*, 553 So.2d at 151; *Winfield*, 477 So.2d at 548, in analyzing whether a reasonable expectation of privacy exists, we cannot ignore the fact that the activities at issue in this case take place in public areas. Even in *Shaktman*, where the court placed great emphasis on the broad reach of Florida's protection of privacy rights, one factor the court considered in finding that an individual had a right to privacy in telephone records was the fact that the records were not open to the public. *Id.* at 151; *see also id.* at 153 (Ehrlich, C.J., concurring); *Stall*, 570 So.2d at 262 (holding that, although Florida's right to privacy is broader than federal right, the right to possess obscene material in the home does not equate to the right to sell it publicly).

The *Shaktman* court reasoned that although the telephone company had access to the records, the expectation of privacy was not defeated where there was no intention that the records would be divulged to any other party. *Id.* at 151 (quoting *People v. Sporleder*, 666 P.2d 135, 141 (Colo. 1983)). Implicit in the court's reasoning is that Shaktman's expectation of privacy would have been defeated, or at least diminished, if the telephone records had been open to the public. In the present case, where plaintiffs are in the unfortunate position of having to perform certain life-sustaining activities in public, this court has difficulty finding that they have a reasonable expectation of privacy in those activities.

In addition, the cases on which plaintiffs rely provide little support for their privacy argument because the cases involve either public disclosure of personal matters or government interference with personal decisionmaking. *See, e.g., Zablocki v. Redhail*, 434 U.S. 374, 384, 98 S.Ct. 673, 680, 54 L.Ed.2d 618 (1978) (recognizing individual's right to marry part of fundamental "right of privacy" implicit in fourteenth amendment's due process clause); *Roe v.*

*Wade,* 410 U.S. 113, 152–55, 93 S.Ct. 705, 726–28, 35 L.Ed.2d 147 (1973) (addressing individual's decision to terminate pregnancy); *Griswold v. Connecticut,* 381 U.S. 479, 481–86, 85 S.Ct. 1678, 1680–83, 14 L.Ed.2d 510 (1965) (extending right of privacy to protect individual's decision about contraception); *In re Guardianship of Browning,* 568 So.2d 4, 10 (Fla.1990) (holding that right of privacy requires courts to safeguard individual's right to choose or refuse medical treatment); *In re T.W.,* 551 So.2d 1186, 1193 (Fla.1989) (extending freedom of choice concerning abortion encompassed by Florida's privacy amendment to minors); *Shaktman v. State,* 553 So.2d 148, 150 (Fla.1989) (finding privacy rights implicated by law enforcement's installation of pen register device on individual's telephone). In contrast to each of these cases, none of the activities for which plaintiffs seek protection under article I, section 23 involves public disclosure or government intrusion into matters that involve personal decisionmaking.

 In sum, the law does not yet recognize an individual's legitimate expectation of privacy in such activities as sleeping and eating in public. Therefore, the court respectfully rejects plaintiffs contention that such activities fall within the ambit of Article I, Section 23 of the Florida Constitution and the corresponding claim.

### 2. Procedural Due Process[32]

 Plaintiffs further contend that, as applied to them, the challenged ordinances violate their right to due process. To review, these ordinances prohibit sleeping in public, being in a public park after hours, obstructing the sidewalk, loitering and prowling and trespassing on public property.

The procedural due process guarantees of the Fourteenth Amendment to the United States Constitution and Article I, Section 9 of the Florida Constitution require that a criminal law be clear and precise, not overbroad. However, a law may be overbroad, even if it is clear and precise, if it reaches conduct that is constitutionally protected, *Grayned v. City of Rockford,* 408 U.S. 104, 114, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972), or conduct that is beyond the reach of the state's police power. *Fenster v. Leary,* 20 N.Y.2d 309, 282 N.Y.S.2d 739, 229 N.E.2d 426, 428 (1967).

A number of courts have overturned vagrancy and loitering statutes on due process grounds after finding them unconstitutionally vague. Before an individual may be criminally punished, he or she must be given fair notice of what type of conduct is prohibited. *Lanzetta v. New Jersey,* 306 U.S. 451, 452, 59 S.Ct. 618, 619, 83 L.Ed. 888 (1939). Therefore, if a person of ordinary intelligence is unable to ascertain from the language of a statute what conduct will subject him to criminal penalties, the statute is unconstitutionally vague. *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed. 989 (1954). For example, writing for a unanimous Court in a leading United States Supreme Court case, Justice Douglas stated that a Jacksonville, Florida vagrancy ordinance was void for vagueness because it failed to give fair notice of the forbidden conduct and because it encouraged arbitrary arrests and convictions. *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972). In *Kolender v. Lawson,* the Supreme Court overturned a California loitering statute that punished failure by any person wandering the streets to produce credible identification when so requested by a police officer. 461 U.S. 352, 361, 103 S.Ct. 1855, 1860, 75 L.Ed.2d 903 (1983). The Court held that this statute, like the vagrancy law invalidated in *Papachristou,* was too vague to satisfy the requirements of due process. *Id.* 461 U.S. at 358, 103 S.Ct. at 1858; *see also Ricks v. District of Columbia,* 414 F.2d 1097, 1100 (D.C.Cir.1968) (holding vagrancy law unconstitutional where it did not provide "reasonable degree of guidance

---

**32.** Plaintiffs also contend that the City's actions violate the substantive component of the due process clause. Because the same standard would apply under the equal protection analysis, *see* text *infra,* the court finds it unnecessary to address separately the issues plaintiffs advance in their substantive due process argument.

to citizens, the police and the courts as to just what constitutes the offenses with which appellant is charged").

Courts also have overturned vagrancy and loitering statutes on due process grounds after finding them overbroad. A statute is overbroad when it reaches constitutionally protected conduct or conduct which is beyond the police power of the state to regulate. *See Sawyer v. Sandstrom*, 615 F.2d 311, 318 (5th Cir.1980) (striking Dade County's loitering statute as unconstitutionally overbroad because it punished essentially innocent association in violation of first amendment associational rights); *Fenster v. Leary*, 20 N.Y.2d 309, 282 N.Y.S.2d 739, 229 N.E.2d 426, 428 (1967) (finding statute violated due process and constituted overreaching of police power because it criminalized conduct that in no way impinged on others' rights and had only tenuous connection with prevention of crime and preservation of the public order); *City of Seattle v. Drew*, 70 Wash.2d 405, 423 P.2d 522, 525 (1967) (holding statute prohibiting wandering at night violated due process where it did not distinguish between "conduct calculated to harm and that which is essentially innocent").

Like the vagrancy and loitering statutes, courts have overturned statutes against sleeping in public on overbreadth grounds. In *State v. Penley*, the court declared unconstitutional an anti-sleeping ordinance which provided as follows: "No person shall sleep upon or in any street, park, wharf or other public place (Code 1955, ch. 25, § 47)." *State v. Penley*, 276 So.2d 180, 180 (Fla. 2d DCA1973). The court noted the similarity between the anti-sleeping ordinance and most vagrancy laws, namely, that both punish unoffending behavior. *Id.* at 181. The court further reasoned that the ordinance drew no distinction between conduct that is calculated to harm and that which is essentially innocent, that the ordi-

nance failed to provide fair notice of the forbidden conduct, and that the ordinance could result in arbitrary and erratic convictions. *Id.* (citations omitted). Similarly, another Florida court partially invalidated an ordinance prohibiting sleeping in cars parked on public streets because the ordinance criminalized conduct that "in no way impinge[d] on the rights or interests of others." *City of Pompano Beach v. Capalbo*, 455 So.2d 468, 470–71 (Fla. 4th DCA1984), *cert. denied*, 474 U.S. 824, 106 S.Ct. 80, 88 L.Ed.2d 65 (1985) (quoting *Lazarus v. Faircloth*, 301. F.Supp. 266, 272 (S.D.Fla.1969)). The court found that such conduct was beyond the scope of the city's police power. *Id. But see Seeley v. State*, 134 Ariz. 263, 655 P.2d 803 (Ariz.App.1982) (finding ordinance prohibiting lying, sleeping or sitting on public streets or sidewalks constitutional).

The City maintains that plaintiffs' due process claim must fail because none of the challenged ordinances is facially vague. However, plaintiffs have not challenged any of the ordinances on vagueness grounds;[33] rather, plaintiffs contend that the ordinances are overbroad, as applied to them, because they reach conduct that is beyond the reach of the City's police power. In addition, plaintiffs do not argue that the challenged ordinances should be stricken. Rather, as in their eighth amendment argument, plaintiffs ask that the City be enjoined from arresting homeless individuals for harmless, involuntary conduct. We now consider plaintiffs' due process claim based on overbreadth.

As with their eighth amendment argument, plaintiffs challenge the City's practice, under any ordinance, of arresting homeless individuals for harmless acts that they are forced to perform in public. For example, arresting a homeless person under the park closure ordinance may reach

---

**33.** Accordingly, this court does not reach the question of whether any of the ordinances is facially vague. We do note however, that some of the ordinances appear to be subject to challenge on facial vagueness grounds. For example, the ordinance against disorderly conduct, which provides that a "person shall be deemed

guilty of disorderly conduct who: ... (2) [i]s idle, dissolute or found begging," Miami, Fla., Code § 37–17 (1990), would probably not survive a facial challenge under *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972).

any number of innocent and essential acts such as sleeping, lying down, or eating.

At first glance, it appears that the law of this circuit may not support plaintiffs' overbreadth claim. In analyzing a challenge to an anti-sleeping ordinance on overbreadth grounds, the Eleventh Circuit has stated as follows:

> The concept of overbreadth will usually only apply when a case involves constitutionally protected conduct. Such a challenge will be upheld only when "the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail." *Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982). Nothing in the pertinent ordinance is aimed at curbing expressive conduct; the sleeping prohibited appears to be "of the general kind, which enjoys no peculiar constitutional advantage." *People v. Davenport*, 222 Cal.Rptr. 736, 738, 176 Cal.App.3d Supp. 10 (Cal.Super.1985), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1794, 90 L.Ed.2d 339 (1986). The overbreadth challenge, then, would probably fail because the Clearwater ordinance did not reach a substantial amount of constitutionally protected activity (and probably reached no constitutionally protected conduct at all): it was in the nature of a valid exercise of the city's broad police powers.

*Hershey v. City of Clearwater*, 834 F.2d 937, 940 n. 5 (11th Cir.1987) (citing *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)). Arguably, based on the above-quoted footnote in *Hershey*, plaintiffs have not established that the park closure ordinance, or any other ordinance, "reaches a substantial amount of constitutionally protected conduct." *Id.* The acts of sleeping, sitting down or eating in themselves are not constitutionally protected. However, unlike *Hershey*, under the unique circumstances of this case, the challenged ordinances as applied to class members do implicate constitutionally protected rights under the eighth amendment and, as discussed in greater detail below, the equal protection clause of the fourteenth amendment.

While sleeping "of the general kind" may "enjoy no peculiar constitutional advantage," *id.*, under the facts of this case arresting plaintiffs for performing innocent conduct in public places—in particular, for being in a park or on public streets at a time of day when there is no place where they can lawfully be—most definitely interferes with their right under the constitution to be free from cruel and unusual punishment and, as will be addressed, their right to freedom of movement. Thus, plaintiffs have shown that the challenged ordinances as applied to them are overbroad to the extent that they result in class members being arrested for harmless, inoffensive conduct that they are forced to perform in public places. Accordingly, the court finds the City liable as to this count.

## H. *Equal Protection*

The equal protection clause of the fourteenth amendment prohibits any state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." In other words, it requires that all persons similarly situated be treated alike. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). The general rule is that legislation is presumed to be valid and should be sustained if the classification it draws is rationally related to a legitimate state interest. *Id.* at 440, 105 S.Ct. at 3254. However, when government actions discriminate on the basis of a suspect classification, such as race, alienage or national origin, they are subject to strict scrutiny and will be sustained only if they are "suitably tailored to serve a compelling state interest." *Id.* Actions or statutes that classify by gender or illegitimacy are also subject to heightened scrutiny and will be sustained only if they are substantially related to a sufficiently important state interest. *Id.* at 440–41, 105 S.Ct. at 3254–55. In addition, government classifications that infringe on constitutionally protected rights also require heightened scrutiny. *See Attorney General of New York v. Soto–Lopez*, 476 U.S. 898, 904, 106 S.Ct.

2317, 2321, 90 L.Ed.2d 899 (1986) (plurality opinion).

### 1. Suspect Class

Plaintiffs claim that they are a suspect class based on their involuntary status of being homeless. They argue that, because there are only two types of property in this country, public and private, and because the homeless have no access to private property, they are an insular minority which has no place to retreat from the public domain.

A classification is suspect if it is directed to a "discrete and insular minority." *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938). As stated, courts have found that race, alienage, national origin, and to a lesser degree, gender and illegitimacy, are suspect classes. *See, e.g., Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254. However, the United States Supreme Court repeatedly has held that classifications based on wealth alone are not suspect. *See, e.g., Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 458, 108 S.Ct. 2481, 2487, 101 L.Ed.2d 399 (1988) ("We have previously rejected the suggestion that statutes having different effects on the wealthy and the poor should on that account alone be subjected to strict equal protection scrutiny.") (citing *Harris v. MacRae*, 448 U.S. 297, 322–23, 100 S.Ct. 2671, 2691, 65 L.Ed.2d 784 (1980) (noting that poverty, standing alone, is not a suspect classification); *Maher v. Roe*, 432 U.S. 464, 470–71, 97 S.Ct. 2376, 2380–81, 53 L.Ed.2d 484 (1977) ("[T]his Court has never held that financial need alone identifies a suspect class for purposes of equal protection analysis."); *Ortwein v. Schwab*, 410 U.S. 656, 660, 93 S.Ct. 1172, 1175, 35 L.Ed.2d 572 (1973) (rejecting argument that filing fee discriminates against poor where no suspect classification such as race, nationality or alienage is present). *See also Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1269 n. 6 (3d Cir.1992) (summarily concluding that homeless do not constitute a suspect class).

In concluding that poverty is not a suspect classification, the Supreme Court has stated as follows:

> The system of alleged discrimination and the class it defines have none of the traditional indicia of suspectness: the class is not saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.

*San Antonio School Dist. v. Rodriguez*, 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973). This court is not entirely convinced that homelessness as a class has none of these "traditional indicia of suspectness." It can be argued that the homeless are saddled with such disabilities, or have been subjected to a history of unequal treatment or are so politically powerless that extraordinary protection of the homeless as a class is warranted. However, resolution of this issue is beyond the scope of the evidence presented at trial and, in any event, is unnecessary for, as discussed below, we resolve the question of the appropriate standard to apply based on our determination that the City has infringed upon plaintiffs' fundamental right to travel.

### 2. Fundamental Rights

Plaintiffs claim that the City's actions have infringed directly on their fundamental right to engage in life-sustaining activities in public and indirectly on their fundamental right to travel.

Plaintiffs argue that the life-sustaining activities they must perform in public are "fundamental" rights. However, plaintiffs have offered no legal support for their contention that these are rights that a court may recognize as "fundamental" for purposes of equal protection analysis. On the other hand, the United States Supreme Court has long recognized the right to travel as a fundamental constitutional right. For example, in *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), the Court held that any classification penalizing the exercise of the fundamental right to travel is unconstitutional

absent a showing that it is necessary to promote a compelling governmental interest. *Id.* at 634, 89 S.Ct. at 1330; *see also Attorney General of New York v. Soto-Lopez,* 476 U.S. 898, 902 n. 2, 106 S.Ct. 2317, 2321 n. 2, 90 L.Ed.2d 899 (1986) (stating that right to travel receives "its most forceful expression in the context of equal protection analysis") (quoting *Zobel v. Williams,* 457 U.S. 55, 67, 102 S.Ct. 2309, 2316, 72 L.Ed.2d 672 (1982) (Brennan, J., concurring)); *Sosna v. Iowa,* 419 U.S. 393, 409–10, 95 S.Ct. 553, 562–63, 42 L.Ed.2d 532 (1975) (addressing right to travel in context of due process analysis); *United States v. Guest,* 383 U.S. 745, 757, 86 S.Ct. 1170, 1177, 16 L.Ed.2d 239 (1966) (noting that constitutional right to travel is fundamental right that has been "firmly established and repeatedly recognized").

Although the Supreme Court has not directly addressed the question of whether the right to travel includes intrastate travel, the Court has found that arresting individuals for loitering or wandering on public streets without identification "implicates consideration of the constitutional right to freedom of movement." *Kolender v. Lawson,* 461 U.S. 352, 358, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *see also Papachristou v. City of Jacksonville,* 405 U.S. 156, 164, 92 S.Ct. 839, 844, 31 L.Ed.2d 110 (1972) (stating that "wandering and strolling" are "historically part of the amenities of life as we have known them"). In addition, lower courts specifically have found that the right extends to travel that occurs within one state. *See, e.g., King v. New Rochelle Municipal Housing Auth.,* 442 F.2d 646, 648 (2d Cir.) (finding five-year residency requirement for state-subsidized housing violated rights of interstate and intrastate plaintiffs), *cert. denied,* 404 U.S. 863, 92 S.Ct. 113, 30 L.Ed.2d 107 (1971); *Lutz v. City of York,* 899 F.2d 255, 268 (3d Cir. 1990) ("the right to move freely about one's neighborhood or town ... is indeed 'implicit in the concept of ordered liberty' and 'deeply rooted in the Nation's history'") (citation omitted); *Stoner v. Miller,* 377 F.Supp. 177, 180 (E.D.N.Y.1974) ("It is immaterial whether travel is interstate or intrastate."); *see also* Ades, *The Constitutionality of "Antihomeless" Laws: Ordinances Prohibiting Sleeping in Outdoor Public Areas as a Violation of the Right to Travel,* 77 Cal.L.Rev. 595, 609–13 (1989) (hereafter *"Antihomeless Laws"*) (discussing decisions supporting fundamental right to intrastate travel). In *King,* the court stated that it would be "meaningless to describe the right to travel between states as a fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to travel within a state." 442 F.2d at 648. Based on this line of cases, the City's arrests of the homeless may burden their fundamental right to travel even if the effect on their freedom of movement occurs only intrastate.

The right to travel can be burdened in a number of ways. For example, in *Shapiro v. Thompson* the Supreme Court struck down statutes denying welfare assistance to residents who had not resided in a state for at least one year on the grounds that the statutes effectively penalized interstate travel. 394 U.S. at 634, 89 S.Ct. at 1330. The court stated that "moving from State to State or to the District of Columbia, appellees were exercising a constitutional right, and any classification which serves to penalize that right, unless shown to be necessary to promote a *compelling* governmental interest, is unconstitutional." *Id.* (citations omitted) (emphasis in original). Similarly, in *Memorial Hospital v. Maricopa County,* the Court found that a statute which conditioned free medical care on a one-year residency requirement violated the equal protection clause because it penalized the exercise of the right to travel by denying a basic "necessity of life." 415 U.S. 250, 259, 94 S.Ct. 1076, 1082, 39 L.Ed.2d 306 (1974). The Court further held that actual deterrence of travel was not a requisite to finding a violation of the equal protection clause. *Id.* at 257–58, 94 S.Ct. at 1081–82 (citing *Dunn v. Blumstein,* 405 U.S. 330, 339–40, 92 S.Ct. 995, 1001–02, 31 L.Ed.2d 274 (1972) (finding durational-residence requirement for voter registration penalized the right to travel)).

In *Edwards v. California,* 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941), the Su-

preme Court held unconstitutional a law prohibiting the transportation of "indigents" into California. While the majority based its decision on the commerce clause, four Justices concluded that the statute impermissibly erected a barrier to interstate travel by indigents. Justice Douglas found that the challenged statute "prevents a citizen because he [is] poor from seeking new horizons in other States." *Id.* at 181, 62 S.Ct. at 170 (Douglas, J., concurring). Also finding that the statute infringed upon the right to travel, Justice Jackson stated as follows:

> Any measure which would divide our citizenry on the basis of property into one class free to move from state to state and another class that is poverty-bound to the place where it has suffered misfortune is not only at war with the habit and custom by which our country has expanded, but also is a short-sighted blow at the security of property itself. Property can have no more dangerous, even if unwitting, enemy than one who would make its possession a pretext for unequal or exclusive civil rights.

*Id.* at 182, 62 S.Ct. at 171 (Jackson, J., concurring).

Courts also have found that laws infringe on the right to travel where their primary objective is to impede migration. One court struck a zoning ordinance that limited the construction of new homes because its express purpose and intended and actual effect was to exclude large numbers of people who otherwise would have immigrated to the city. *See Construction Industry Association v. City of Petaluma,* 375 F.Supp. 574, 581 (N.D.Cal.1974), *rev'd on other grounds,* 522 F.2d 897 (9th Cir. 1975).

One commentator argues persuasively that anti-sleeping ordinances can burden the right to travel of homeless individuals when they create direct barriers to travel, are intended to impede travel or penalize migration. *Antihomeless Laws* at 616.

This is so particularly when no alternative shelters are available because laws that prevent homeless individuals from seeking shelter in the limited areas that do exist result in their facing the choice of being arrested for violating the law or of leaving the jurisdiction altogether.[34]

 Like the anti-sleeping ordinances, the City's enforcement of laws that prevent homeless individuals who have no place to go from sleeping, lying down, eating and performing other harmless life-sustaining activities burdens their right to travel. As the Supreme Court explained, laws penalize travel if they deny a person a "necessity of life," such as free medical care. *Memorial Hosp.,* 415 U.S. at 258–59, 94 S.Ct. at 1082–83. Similarly, preventing homeless individuals from performing activities that are "necessities of life," such as sleeping, in any public place when they have nowhere else to go effectively penalizes migration. Indeed, forcing homeless individuals from sheltered areas or from public parks or streets affects a number of "necessities of life"—for example, it deprives them of a place to sleep, of minimal safety and of cover from the elements.

In addition to depriving homeless individuals of certain life necessities, arresting them for such harmless conduct also acts as a deterrent to their movement. Although, unlike the anti-sleeping ordinances, the park closure ordinance is not in effect twenty-four hours a day, homeless individuals are subject to arrest for being in public places under other ordinances, for example, for loitering or for obstructing the sidewalk. The evidence overwhelmingly shows that plaintiffs have no place where they can be without facing the threat of arrest. Given the vast number of homeless individuals and the disproportionate lack of shelter space, the plaintiffs truly have no place to go. Because they offer no protection from the elements or from crime, many of the plaintiffs' choices for alternative shel-

**34.** For example, even where there is available space in a shelter, it may not be a viable alternative "if, as is likely, the shelter is dangerous, drug infested, crime-ridden, or especially unsanitary.... Giving one the option of sleeping in a space where one's health and possessions are seriously endangered provides no more choice than does the option of arrest and prosecution." *Antihomeless Laws* at 620 n. 183.

ter—e.g., the space under bridges or the streets—cannot be considered reasonable or realistic choices at all. Consequently, the enforcement of ordinances, e.g., against being in the park after hours or against loitering, effectively bans homeless individuals from all public areas and denies them a single place where they can be without violating the law. Like the anti-sleeping ordinances, enforcement of the challenged ordinances against homeless individuals significantly burdens their freedom of movement. It has the effect of preventing homeless people from coming into the City. Primarily, however, it has the effect of expelling those already present and of significantly burdening their freedom of movement within the City and the state. For example, a homeless person who is forced to sleep in public must keep moving within the city or leave it altogether to avoid being arrested.

Finally, as discussed above, various internal memoranda admitted into evidence at trial indicate that, at least in the past, the primary purpose behind enforcing the challenged ordinances against homeless persons was to drive them from public areas. *See* Plaintiffs' Exhibits 2–7. This purpose was also evidenced by the arrest records showing the shift to other ordinances for arresting homeless individuals after the City stopped enforcing the ordinance against sleeping in public and by the internal memoranda revealing the City's active search for laws to replace the anti-sleeping ordinance.

In sum, whether characterized as a penalty, a deterrent or a purposeful expulsion, enforcement of the ordinances against the homeless when they have absolutely no place to go effectively burdens their right to travel. Having concluded that arresting class members infringes upon their right to travel, we next consider whether the City's action of arresting plaintiffs for harmless, life-sustaining conduct serves a compelling state interest through the least intrusive means.

The interests advanced by the City to justify the arrests of homeless individuals for conduct such as congregating under bridges, lying down on public sidewalks or being in the park after hours may be summarized as follows. The City contends that it has a compelling interest in keeping its parks and streets free of litter, vandalism and general deterioration; in preventing crime and ensuring safety in public parks; and in promoting tourism, business and the development of the downtown area, which are negatively affected by the presence of the homeless. We must weigh these interests to determine whether or not they are compelling and, if so, whether they are accomplished through the least intrusive means.

The City claims that it has a compelling interest in maintaining its parks and public areas, an interest which is related to its desire to promote tourism, business and the downtown area. The City has a legitimate interest in having aesthetically pleasing parks and streets and in maintaining facilities in public areas. However, this interest is not compelling, especially in light of the necessity of homeless persons to be in some public place when no shelter is available. The Supreme Court has recognized the governmental interest in park maintenance as being only "substantial,"[35] which does not satisfy the "compelling governmental interest" standard. *See, e.g.,* *Williams v. Rhodes,* 393 U.S. 23, 31–34, 89 S.Ct. 5, 10–12, 21 L.Ed.2d 24 (1968) (finding compelling state interest standard not satisfied despite existence of substantial and desirable governmental interests). Similarly, the City's interest in promoting tourism and business and in developing the downtown area are at most substantial, rather than compelling, interests.

Even assuming these asserted interests

---

**35.** *See Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 296, 104 S.Ct. 3065, 3070, 82 L.Ed.2d 221 (1984) (recognizing government interest in maintaining park as "substantial" in upholding prohibition against camping, includ-

could be considered compelling,[36] the City could certainly accomplish them through some manner that is less intrusive than arresting homeless individuals. Provision of alternative shelter and services would be the ideal means of accomplishing the same goals. However, in the absence of available shelter space or funds for services, the parks and streets could be cleaned and maintained without arresting the homeless. For example, the City could ask homeless individuals to relocate temporarily to another public area while maintenance crews work on a particular site. It could also establish regular times for each park to be cleaned so that homeless individuals would know not to be in a certain park on a particular day. Instead of arresting homeless individuals for being in the park after hours, the City could allow them to stay in a designated area in exchange for maintaining that area. Similarly, promotion of tourism and business and the development of the downtown area could be accomplished without arresting the homeless for inoffensive conduct. Because the City's interests in maintaining public areas and in promoting tourism and business can be achieved without arresting homeless individuals, these interests cannot justify the burden that the arrests place on the right to travel.

The City further contends that it has a compelling interest in ensuring that its parks are free of crime. The court recognizes the tremendous responsibility that the City has and agrees that the City's interest in this regard is a compelling one. However, the City has not shown that arresting the homeless for being in the park after hours when they have no place else to go is the least intrusive means of addressing the interest in crime prevention.[37]

The City claims that the arrests are necessary, or at least justified, because unlike the arrests made under vagrancy ordinances, the arrests of homeless individuals

under various ordinances are effected after citizens file complaints and police officers observe other criminal activity. However, the arrests records and the internal police memoranda refute this contention. This evidence shows that numerous arrests were made not in response to citizen complaints, but as a result of police sweeps targeting areas where the homeless were known to reside or congregate.

The City further argues that it would be disingenuous to ignore the criminal element among the homeless. However, there is a criminal element among all of society, not just among the homeless. The United States Supreme Court, in rejecting the idea that criminality can be ascribed to the unfortunate, stated that no one can seriously contend that a person without funds and without a job constitutes a "moral pestilence." *Edwards v. California*, 314 U.S. 160, 177, 62 S.Ct. 164, 168, 86 L.Ed. 119 (1941). The Court further stated that "[p]overty and immorality are not synonymous." *Id.; see also Papachristou*, 405 U.S. at 171, 92 S.Ct. at 848 (criticizing presumption of criminality in vagrancy statutes). In fact, the City presented no evidence that a homeless person committed any of the crimes reported in the citizen complaints. Furthermore, as the narrative sections of the arrest records show, many of the homeless individuals arrested under the park closure ordinance were doing nothing more than sleeping. *See* Plaintiffs' Exhibits 1A–1AAA.

In addressing a recent first amendment challenge by homeless people to a statute prohibiting begging, one court considered whether arresting homeless individuals for begging was a sufficiently narrow means of serving the government's interest in preserving public order and preventing crime. *Loper v. New York City Police Dept.*, 802 F.Supp. 1029, 1046 (S.D.N.Y.1992). The court stated as follows:

ing ban on sleeping overnight, in national parks).

36. The City's interest in maintaining public areas for the purpose of preventing health hazards would be compelling.

37. As is implicit in this order, the court does not in any manner intimate that police officers should not arrest promptly any of the homeless for any criminal activity.

A peaceful beggar poses no threat to society. The beggar has arguably only committed the offense of being needy. The message one or one hundred beggars sends society can be disturbing. If some portion of society is offended, the answer is not in criminalizing those people, debtor's prisons being long gone, but addressing the root cause of their existence. The root cause is not served by removing them from sight, however; society is then just able to pretend that they do not exist a little longer.

*Id.* Similarly, although the idea of homeless people sleeping in public parks may disturb or offend some portion of society, the answer is not in arresting individuals who have arguably only committed the offense of being without shelter. There exist other means of preventing crime that are less drastic than arresting the homeless for harmless conduct that poses no threat to society. Rather than arrest the homeless, the City could increase police patrols of the park. It could allow homeless persons who have no alternative place to sleep to remain in a limited area instead of banishing them from the park entirely. In addition, the City could issue warnings to both homeless and non-homeless people about high-crime areas. In short, arresting homeless people is not the least intrusive means of achieving the City's compelling interest in preventing crime in public parks. Accordingly, the court rejects the City's contention that its interest in crime prevention justifies the infringement on the fundamental right to travel.

In summary, arresting homeless individuals for such harmless acts as sleeping, eating, or lying down in public generally serves no compelling governmental interest. Furthermore, in no case are such arrests the least intrusive means of accomplishing the City's interests. Consequently, arresting the homeless for the harmless acts which they are forced to perform in public infringes on their fundamental right to travel.

## IV. CONCLUSION

For the reasons set forth above, the court finds that plaintiffs have established that the City has a policy and practice of arresting homeless individuals for the purpose of driving them from public areas. The court concludes that the City's practice of arresting homeless individuals for performing inoffensive conduct in public when they have no place to go is cruel and unusual in violation of the eighth amendment, is overbroad to the extent that it reaches innocent acts in violation of the due process clause of the fourteenth amendment and infringes on the fundamental right to travel in violation of the equal protection clause of the fourteenth amendment. The court further concludes that the City's seizure of plaintiffs' personal property violates their fourth amendment rights. For these reasons, the court finds that plaintiffs' claim for injunctive relief is warranted.

As a threshold matter, this court finds that it can fashion relief with the specificity required by Rule 65(d) of the Federal Rules of Civil Procedure. Unlike December of 1988, when this court denied plaintiffs' application for injunctive relief because it was unable to redress the general allegation of "harassment" of homeless individuals with the requisite specificity, the court now has before it plaintiffs' more detailed allegations of specific conduct. Additionally, the court has had the benefit of having heard substantial evidence, which brings greater definition to the problems of homelessness as they affect both parties.

Obviously, the ideal solution would be to provide housing and services to the homeless. However, assembling and allocating such resources is a matter for the government—at all levels—to address, not for the court to decide. Rather, our immediate task is to fashion relief that accommodates the two predominant interests in this litigation. First, such relief must protect the homeless from one approach that clearly is not the answer to homelessness, that is, arresting homeless people for innocent, involuntary acts. Second, any relief granted must not unduly hamper the City's ability to preserve public order. For these reasons and for the reasons set forth above in the findings of fact and conclusions of law, it is

ORDERED AND ADJUDGED that

(1) The City's practice of arresting homeless individuals for the involuntary, harmless acts they are forced to perform in public is unconstitutional because such arrests are cruel and unusual in violation of the eighth amendment, reach innocent and inoffensive conduct in violation of the due process clause of the fourteenth amendment and burden the fundamental right to travel in violation of the equal protection clause; and

(2) The City's practice of seizing and destroying the property of homeless individuals without following its own written procedure for handling found or seized personal property violates plaintiffs' rights under the fourth amendment. Accordingly, it is further

ORDERED AND ADJUDGED that plaintiffs' request for injunctive relief is granted as follows:

(3) The City, through its Police Department, is enjoined from arresting homeless individuals who are forced to live in public for performing innocent, harmless, inoffensive acts such as sleeping, eating, lying down or sitting in at least two public areas to be agreed upon by the parties;

(4) Counsel for both parties are directed to meet within fifteen (15) days from the date of this order to establish two "safe zones" where homeless people who have no alternative shelter can remain without being arrested for harmless conduct such as sleeping or eating. In establishing these arrest-free zones, counsel should consider the proximity of the areas to feeding programs, health clinics and other services. In addition, the parties are encouraged to develop a procedure for maintaining the areas.[38] Counsel are directed to submit a joint report within thirty (30) days regarding the outcome of their meeting.

(5) Until the parties reach an agreement on two arrest-free zones, the City is enjoined from arresting homeless individuals for sleeping or eating in a portion of Bicen-

tennial Park to be designated by the City and in the area beneath the I–395 overpass that is still occupied by the homeless;

(6) The court emphasizes that nothing in this order prevents the City from arresting any individual for any criminal activity or for any conduct that is harmful to others or to himself. In addition, nothing in this order affects the ability of police officers to make arrests on private property;

(7) As in the March 18, 1991 order, the City, through the Police Department or any other city department, is enjoined from destroying property which it knows or reasonably should know belongs to homeless individuals. In determining whether property belongs to the homeless, police officers and other city officials should consider factors such as the nature and appearance of the items. As discussed above, property belonging to the homeless is typically located in areas where the homeless congregate or reside and is often arranged in a manner suggesting ownership;

(8) In addition, the City shall follow its own written procedure concerning the handling of personal property and found property. See Defendant's Exhibit 3 (describing "Policy for Handling Evidence, Found Property and Personal Property"). This requirement does not apply to property that poses a health or safety hazard; and

(9) To avoid hindering the City's ability to maintain public parks, while at the same time protecting plaintiffs' property interests, the City is encouraged to arrange the cleaning schedule agreed to by the parties in their June 12, 1992 report. See Parties' Report on Defendant's Motion Seeking Clarification of Order Entered March 18, 1991, filed June 12, 1992 (D.E. 250) (setting forth parties' agreement, at least during pendency of suit, as to procedure for handling property of homeless). The City is also directed to provide the public with at least five days' notice of the days and times that particular parks will be cleaned. This

---

**38.** For example, a cleaning schedule could be established which would involve the partic- ipation of homeless individuals in maintaining the areas where they are permitted to stay.

will enable homeless individuals to move their property temporarily from the area scheduled to be cleaned to a nearby place designated by the City.

Finally, it is ORDERED AND ADJUDGED that

(10) Plaintiffs' Unopposed Motion to Supplement Trial Record with Exhibits (D.E. 271) is GRANTED.

DONE AND ORDERED.